CONSTANCE SAVAGE ET AL. *v.* LORRAINE M. ARONSON,
COMMISSIONER OF INCOME MAINTENANCE
(13796)

HEALEY, SHEA, CALLAHAN, GLASS, COVELLO, HULL and SANTANIELLO, Js.

Argued January 9—decision released March 20, 1990

*Hugh Barber,* assistant attorney general, with whom were *Martin Rosenfeld,* assistant attorney general, and, on the brief, *Clarine Nardi Riddle,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the appellant (defendant).

*Graham Boyd,* certified legal intern, with whom were *Robert A. Solomon* and, on the brief, *Stephen Wizner, Jean Koh Peters, J. L. Pottenger, Jr., Mary McCarthy* and *Carroll Lucht,* for the appellees (plaintiffs).

SHEA, J. The principal issue in this case is whether the defendant commissioner of income maintenance may be enjoined from reducing the period of eligibility for emergency housing of Aid to Families with Dependent Children (AFDC) recipients from 180 to 100 days following their eviction or other displacement from their former homes. The named plaintiff and seven other mothers of dependent children were receiving AFDC benefits and were residing in various motels in New Haven that had been made available to them as emergency housing because of their inability to find affordable housing. They brought this action seeking

certification as a class, injunctive relief, a declaratory judgment, and attorney's fees in relation to the 100 day per calendar year limit on emergency housing that had been established by the department of income maintenance (DIM). After certifying the plaintiffs, pursuant to Practice Book § 88, as representatives of the class of all AFDC recipients receiving emergency housing benefits, the trial court rendered judgment for the plaintiffs enjoining the commissioner from enforcing the 100 day limit upon emergency housing benefits and declaring that the limit violated General Statutes §§ 17-85, 17-82d and 17-38a (a) as well as various provisions of our federal and state constitutions. The court denied the claim for attorney's fees.[1] See *Doe* v. *Heintz,* 204 Conn. 17, 526 A.2d 1318 (1987).

In her appeal from the judgment, the commissioner claims that the trial court erred: (1) in failing to dismiss the action for lack of jurisdiction because (a) the case was tried as a "housing matter," as the complaint alleged, rather than as an ordinary civil action, (b) the defense of sovereign immunity was available and (c) the plaintiffs failed to exhaust their administrative remedies; (2) in holding that the limitation of emergency housing benefits to 100 days violates §§ 17-85, 17-82d and 17-38a (a); (3) in declaring that this limitation violates the rights of the AFDC recipients and their children to family integrity and to education as those rights are protected by our federal and state constitutions; and (4) in issuing an injunction that (a) transgresses the principle of separation of powers and (b) conflicts with the requirements of federal law. We conclude that the court did not lack jurisdiction to entertain this action, but that its interpretation or application of the statutory and constitutional provisions relied upon was erroneous. As these determinations are dispositive of the appeal, we do not address the fourth claim of error.

---

[1] The plaintiffs have not appealed from this determination.

Accordingly, we set aside the judgment and remand the case with direction to render judgment for the commissioner.

The subordinate facts are not disputed. In addition to the payments made to AFDC recipients for food, shelter and other necessities in the form of a basic grant equal to the "standard of need" as determined pursuant to General Statutes § 17-2, an emergency housing program has been established by the commissioner as a "special needs" program, under which payments are made to those who provide temporary housing to families who have lost their former homes and are unable to find housing they can afford in the marketplace. The maximum period for which these emergency housing payments would be made was 180 days until May, 1988, when it was reduced to 100 days. The emergency housing program itself, as well as the limitations on the period of its availability for a particular AFDC recipient, are the subject of DIM regulations and are not controlled by any specific statute. The money supporting the emergency housing program, like that used for payment of the AFDC basic grants, is provided under a "matching funds" plan by the state and by the federal government, each paying approximately one half. Emergency housing benefits are given to all eligible applicants by DIM regardless of prior legislative appropriations. Even after the initial legislative appropriation has been exhausted, the payments for housing qualified AFDC recipients have continued to be made and the commissioner has retrospectively sought a deficiency appropriation from the legislature. In the July 1988—1989 fiscal year the original six million dollar appropriation for the emergency housing program was increased through a deficiency appropriation by an additional six million dollars.

As previously indicated, eight plaintiffs who represent the class and their children resided in various

motels and similar facilities in the New Haven area to which they had been assigned by DIM after being displaced from their former homes. After each of these plaintiffs had been notified that the 100 day period for which emergency housing had been provided to them would terminate on April 11, 1989, they commenced this action on April 10, 1989, claiming that they had no reasonable alternative but to remain at the emergency housing locations where they were situated, because they had been unable to find permanent housing they could afford.

The trial court on April 14, 1989, issued a temporary injunction prohibiting the commissioner from terminating the emergency housing benefit of any member of the plaintiff class. After the case had been fully tried, the court, declaring the 100 day limit on emergency housing invalid, enjoined the commissioner from enforcing that regulation and from removing the plaintiffs and putative members of the class from emergency housing, except to place them in permanent homes. The commissioner's application to stay the judgment was denied.[2]

I

The commissioner has raised three grounds in support of her claim that the trial court lacked jurisidiction of this case and erred in denying her motion to dismiss: (1) the inappropriateness of treating this complex case as a "housing matter" to be heard by the judge assigned to hear such matters in New Haven; (2) the sovereign immunity of the state; and (3) the failure of the plaintiffs to exhaust administrative remedies. We find none of these grounds meritorious.

---

[2] The commissoner filed a motion for review of the denial of her application for a stay. After reviewing the matter, this court denied relief.

## A

General Statutes § 47a-70 (a)[3] provides that "[a]ll proceedings involving a housing matter in the judicial district of . . . New Haven . . . shall first be placed on the housing docket for that district . . . ." The commissioner, relying on this provision, maintains that the "housing courts" were established for the limited purpose of handling housing litigation exclusively, and that the issues raised in this case far exceed the scope of housing matters as defined by General Statutes § 47a-68.[4]

---

[3] "[General Statutes] Sec. 47a-70. HOUSING DOCKET. ENTRY AND TRANSFER OF CASES ON DOCKET. (a) All proceedings involving a housing matter in the judicial district of Hartford-New Britain, New Haven, Fairfield, Waterbury or Stamford-Norwalk shall first be placed on the housing docket for that district, provided that the judge before whom such proceeding is brought may transfer such matter to the regular docket for a geographical area or judicial district if he determines that such matter is not a housing matter or that such docket is more suitable for the disposition of the case. Any case so entered or transferred to either docket shall be proceeded upon as are other cases of like nature standing on such docket."

[4] "[General Statutes] Sec. 47a-68. DEFINITIONS. As used in this chapter, sections 51-51v, 51-165, 51-348 and subsection (b) of section 51-278, 'housing matters' means:

"(a) Summary process;

"(b) Appeals from the decisions of a fair rent commission under sections 7-148e and 7-148f;

"(c) Actions and administrative appeals involving discrimination in the sale or rental of residential property;

"(d) All actions regarding forcible entry and detainer;

"(e) Actions under the provisions of title 47a or under the provisions of section 47-294;

"(f) All actions involving one or more violations of any state or municipal health, housing, building, electrical, plumbing, fire or sanitation code or any other statute, ordinance or regulation concerned with the health, safety or welfare of any occupant of any housing;

"(g) All actions under sections 47a-56a to 47a-59, inclusive;

"(h) All actions for back rent, damages, return of security deposits and other relief arising out of the parties' relationship as landlord and tenant or owner and occupant;

"(i) All other actions of any nature concerning the health, safety or welfare of any occupant of any place used or intended for use as a place of

Accordingly, she contends that the trial court lacked jurisdiction of the subject matter of the complaint.[5]

Despite the familiar reference to the judicial district courtroom where the judge assigned to hear housing matters presides as the "housing court," our statutes create no such special jurisdictional entity. "Housing matters" are included within the jurisdiction of the Superior Court, just as family relations matters, small claims matters and juvenile matters are so included. General Statutes § 51-164s. The Superior Court, pursuant to General Statutes § 51-164t and Practice Book § 2, has been divided into four divisions: family, civil criminal and housing. The family, civil and criminal divisions have been subdivided into "parts," but not the housing division. Practice Book §§ 3, 4, 5 and 5A. The evident purpose of the statutes and rules relating to the divisions of the Superior Court was not to impose any jurisdictional limitation on judges but to achieve greater efficiency in the administration of the judicial department. The Superior Court judges assigned to each division or part thereof are authorized by Practice Book § 212 to transfer cases to different court locations as well as between judicial district and geographical area courts. A judge assigned to the housing division at a particular judicial district is authorized by § 47a-70.(a), after a case has first been placed on the housing docket, to "transfer such matter to the regular docket for a geographical area or judicial district if he determines that such matter is not a housing matter or that such docket is more suitable for the disposition of the case."

human habitation if any such action arises from or is related to its occupancy or right of occupancy."

[5] Although this issue was not raised in the trial court as a ground for the commissioner's motion to dismiss, it may be raised on appeal as a claim implicating subject matter jurisdiction.

Even if it were clear that the complaint fails to allege circumstances constituting a housing matter as defined by § 47a-68, it is plain that such a deficiency did not deprive the trial court of jurisdiction over the action. A judge of the Superior Court assigned to hear housing matters does not lose his general authority to hear any cause of action pending in that court. Since the plaintiffs' action was properly brought to the Superior Court, the trial judge, as a member of that court, did not lack jurisdiction to decide it.

The commissioner's claim that this case is not a housing matter is essentially an objection to venue rather than to jurisdiction, because it does not implicate the authority of the Superior Court to entertain the case but involves only the question of whether one division of that court rather than another should properly have heard the case. "Venue is not a jurisdictional question but a procedural one." 77 Am. Jur. 2d, Venue § 1. Statutory venue requirements "simply [confer] a privilege not to be required to attend court at a particular location. Id., § 45." *Farricielli* v. *Personnel Appeal Board,* 186 Conn. 198, 207, 440 A.2d 286 (1982) (*Shea, J.,* dissenting). "Accordingly it may be waived by the parties, unlike subject matter jurisdiction, which cannot be conferred by consent." Id.

The commissioner's motion to dismiss did not question whether the complaint alleged a housing matter but was based upon sovereign immunity and failure to exhaust administrative remedies. The trial court, therefore, had no occasion to address the issue the commissioner has belatedly raised on appeal. We hold that, in failing to raise this issue by a seasonable motion to transfer, the commissioner must be deemed to have waived any such deficiency in the complaint and is barred from raising the question on appeal. See *State* v. *Orsini,* 187 Conn. 264, 269–71, 445 A.2d 887 (1982).

## B

The commissioner claims that the complaint should have been dismissed because her actions that are the basis for the suit were performed in her official capacity, as the plaintiffs concede,[6] and she, therefore, may invoke the mantle of the state's sovereign immunity. A suit against a state officer concerning his official acts is, "in effect, against the state," and sovereign immunity is available to bar a suit against the officer just as if the state itself were the defendant. *Sentner* v. *Board of Trustees,* 184 Conn. 339, 342, 439 A.2d 1033 (1981); see *Doe* v. *Heintz,* supra, 31.

We have held, however, that "[s]overeign immunity does not bar suits against state officials acting in excess of their statutory authority"; *Doe* v. *Heintz,* supra; or in violation of constitutional rights. *Horton* v. *Meskill,* 172 Conn. 615, 624, 376 A.2d 359 (1977). The complaint in this case alleged that the defendant had failed "to meet her legal duty" as prescribed by §§ 17-85, 17-82d and 17-38a (a) to provide for support of the plaintiffs and their children in homes suitable for their upbringing and in health and decency. It is also alleged that, by requiring these AFDC recipients to leave emergency housing before they are able to obtain permanent housing, the commissioner has violated their constitutional rights to family unity and to adequate education.[7] Since the court, in deciding a motion to dismiss, "must consider the allegations of the complaint in their most favorable light"; *Reynolds* v. *Soffer,* 183 Conn. 67, 68, 438 A.2d 1163 (1981); it is evident that the plaintiffs

[6] The complaint alleges that the commissioner is being sued in her official capacity.

[7] These constitutional claims were added to the original complaint by an amendment after the commissioner had filed her motion to dismiss relying upon sovereign immunity and failure to exhaust administrative remedies.

profess to claim breaches of the statutory obligations of the commissioner that have also resulted in violations of their constitutional rights.

The commissioner contends that the trial court erred by overlooking the distinction between acts of a state official that are in excess of statutory authority and those that constitute an erroneous exercise of that authority. Previous decisions of this court have carefully distinguished situations in which the official acted within the limitations of his authority from those in which official duty was transcended. *Weaver* v. *Ives,* 152 Conn. 586, 590, 210 A.2d 661 (1965). We have not applied this distinction, however, when the malfeasance or nonfeasance of a state officer is alleged to constitute a violation of a constitutional right. *Doe* v. *Heintz,* supra; *University of Connecticut Chapter AAUP* v. *Governor,* 200 Conn. 386, 388, 512 A.2d 152 (1986); *Sentner* v. *Board of Trustees,* supra; *Rogan* v. *Board of Trustees,* 178 Conn. 579, 583, 424 A.2d 274 (1979); *Horton* v. *Meskill,* supra. The plaintiffs have plainly alleged that the commissioner has violated their constitutional rights by failing to perform her statutory duties. We need not, therefore, consider whether the breaches of duty relied upon constitute a wrongful exercise of authority rather than actions in excess of authority.[8]

Finally, the commissioner maintains that the scope of the injunction issued as part of the judgment far exceeds the restrictions this court has placed on the relief to be granted to a successful plaintiff in an action against a state official. She claims that the relief should have been limited to a declaratory judgment, deferring

---

[8] The trial court construed the complaint to allege that the commissioner had acted "illegally and in excess of her statutory authority in promulgating and enforcing a regulation which is not authorized by and is contrary to the enabling statutes."

any further remedy until such time as the legislature had an opportunity to review the court's interpretation of the statutes involved and either to accept the additional financial burden entailed or to amend the statutes. "We have excepted declaratory and injunctive relief from the sovereign immunity doctrine on the ground that a court may fashion these remedies in such a manner as to minimize disruption of government and to afford an opportunity for voluntary compliance with the judgment." *Doe* v. *Heintz,* supra, 32; *Sentner* v. *Board of Trustees,* supra, 344–45.

Whether the injunction granted in this case conforms to these principles or infringes upon powers constitutionally reserved to other government departments is extraneous to whether the court should have granted the commissioner's motion to dismiss on the ground of sovereign immunity. In addition to injunctive relief, the complaint sought a declaratory judgment which was awarded and is not claimed to transgress the limitations we have imposed on remedies against the sovereign. Whether it would have been preferable after rendering the declaratory judgment to await a legislative response before acting upon the claims for equitable relief; see *Horton* v. *Meskill,* supra, 650–53; the court plainly had jurisdiction to hear the case and render appropriate relief despite the claim of sovereign immunity.

C

"[W]hen an adequate administrative remedy is provided by law, it should be exhausted." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 357, 377 A.2d 1099 (1977). The commissioner relies on this familiar principle as her final ground in support of her claim of lack of jurisdiction. She maintains that two administrative remedies were available to the plaintiffs: (1) a "fair hearing" under General Statutes

§ 17-2a,[9] which any "aggrieved person" may request; and (2) a petition for a declaratory ruling by DIM as to the validity of the regulation limiting emergency housing to 100 days.

The plaintiffs point out, however, that the DIM regulations concerning fair hearings require the dismissal or denial of a request for such a hearing when "the sole issue is one of state or federal law requiring automatic benefit adjustment for a class of recipients." Department of Income Maintenance Uniform Policy Manual § 1570.05 C. 4. The 100 day limit on emergency housing, the "sole issue" in this case, is contained in an agency regulation and thus constitutes "state law." A valid regulation has the force of a statute. *Fidelity & Casualty Co.* v. *Darrow,* 161 Conn. 169, 179, 286 A.2d 288 (1971). Since the regulation contains no exception for individual circumstances, it requires automatic adjustment of the benefits being received by AFDC recipients who have resided in emergency housing for more than 100 days. We agree with the plaintiffs that requests for a fair hearing pursuant to § 17-2a would

[9] "[General Statutes] Sec. 17-2a. FAIR HEARINGS BY COMMISSIONER. APPLICATION. An aggrieved person authorized by law to request a fair hearing on a decision of the commissioner of income maintenance, or the conservator of any such person on his behalf, may make application for such hearing in writing over his signature to the commissioner and shall state in such application in simple language the reasons why he claims to be aggrieved. Such application shall be mailed to the commissioner within sixty days after the rendition of such decision. The commissioner shall thereupon hold a fair hearing within thirty days from receipt thereof and shall, at least ten days prior to the date of such hearing, mail a notice, giving the time and place thereof, to such aggrieved person, or if the application concerns a denial of or failure to provide emergency housing, the commissioner shall hold a fair hearing within four business days from receipt thereof, and shall make all reasonable efforts to provide notice of the time and place of the fair hearing to such aggrieved person at least one business day prior to said hearing. A reasonable period of continuance may be granted for good cause. No hearing shall be held after the decease of the aggrieved person. The aggrieved person shall appear personally at the hearing and may be represented by an attorney or other authorized representative. . . ."

have been futile in view of the DIM regulation that makes this remedy unavailable to a class of AFDC recipients challenging the validity of another departmental regulation intended to be applied uniformly to all such recipients.

There is a firmer basis for the commissioner's contention that a petition for a declaratory ruling was an available administrative remedy. Section 4-176 (a)[10] of the Uniform Administrative Procedure Act provides that "[a]ny person may petition an agency . . . for a declaratory ruling as to the validity of any regulation . . . ." Section 4-175,[11] as in effect prior to

[10] "[General Statutes] Sec. 4-176. DECLARATORY RULINGS. Each agency may, in its discretion, issue declaratory rulings as to the applicability of any statutory provision or of any regulation or order of the agency, and each agency shall provide by regulation for the filing and prompt disposition of petitions seeking such rulings. If the agency issues an adverse ruling, the remedy for an aggrieved person shall be an action for declaratory judgment under section 4-175 unless the agency conducted a hearing pursuant to sections 4-177 and 4-178 for the purpose of finding facts as a basis for such ruling, in which case the remedy for an aggrieved person shall be an appeal pursuant to section 4-183. If the agency fails to exercise its discretion to issue such a ruling, such failure shall be deemed a sufficient request by the plaintiff for the purposes of section 4-175. Rulings disposing of petitions have the same status as agency decisions or orders in contested cases."

This statute, in effect at the time this action was instituted, was amended by No. 88-317 of the 1988 Public Acts, effective July 1, 1989.

[11] "[General Statutes] Sec. 4-175. DECLARATORY JUDGMENT ACTION TO DETERMINE VALIDITY OR APPLICABILITY OF A REGULATION OR ORDER. The validity or applicability of a regulation or order of an agency may be determined in an action for declaratory judgment brought in the superior court for the judicial district of Hartford-New Britain, if the regulation or order, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The agency shall be made a party to the action. A declaratory judgment may not be rendered unless the plaintiff has requested the agency to pass upon the validity or applicability of the regulation or order in question, pursuant to section 4-176, and the agency has either so acted or has declined to exercise its discretion thereunder."

This statute, in effect at the time this action was instituted, was amended by No. 88-317 of the 1988 Public Acts, effective July 1, 1989.

July 1, 1989, provides that, after the agency has acted on a petition filed pursuant to § 4-176, "[t]he validity . . . of a regulation . . . may be determined in an action for declaratory judgment brought in the superior court for the judicial district of Hartford-New Britain, if the regulation . . . or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." A petition for a declaratory ruling would have permitted the plaintiffs to challenge the 100 day emergency housing limit as conflicting with our statutes. They could not have raised their constitutional claims of invalidity in such a petition, however, because the adjudication of such constitutional issues is reserved exclusively to the judiciary. *Cioffoletti* v. *Planning & Zoning Commission*, 209 Conn. 544, 551, 552 A.2d 796 (1989); *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 416, 544 A.2d 186 (1988); *Stratford* v. *Local 134, IFPTE*, 201 Conn. 577, 586, 519 A.2d 1 (1986); *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985). We have indicated that nonjudicial branches of government "exceed their authority when they address the constitutional validity of a statute." *New Haven* v. *AFSCME, Council 15, Local 530*, supra. Since a regulation commands the same obedience as a statute, the arbiter of its constitutionality must be of equal competence and authority. The constitutional claims of the plaintiffs are not directed to the application of the regulation to individual plaintiffs whose circumstances may create a special hardship, but to the class of plaintiffs as a whole, when the time for which the regulation makes emergency housing available has expired. Despite the commissioner's claim to the contrary, there is no basis for distinguishing the DIM regulation at issue from a statute that is constitutionally challenged in its general application and not merely in its application to individual circumstances.

Although a petition under § 4-176 challenging the validity of the regulation on statutory grounds might have been successful and obviated the need for a constitutional attack, the trial judge was faced with the reality that, when the case came before him, the eight plaintiffs who represent the class were subject to termination of their emergency housing benefits immediately and such relief as might be afforded by the administrative process would come too late to protect their interests, if the plaintiffs should ultimately prevail. The commissioner does not claim that such equitable relief as that granted by the court would have been available through her department. We have held that when "[t]he relief sought and the issues raised are distinctly equitable in nature," administrative remedies were not adequate, even though some of the issues involved could have been resolved before an administrative agency. *Bianco* v. *Darien,* 157 Conn. 548, 554, 254 A.2d 898 (1969). "In order that another remedy be adequate, it must be equally complete and completely practical." *State ex rel. Golembeske* v. *White,* 168 Conn. 278, 283, 362 A.2d 1354 (1975). We agree with the trial court that the administrative route would not have provided the plaintiffs with a sufficiently expeditious remedy by which to resolve all the issues raised in challenging the regulation in time to afford the plaintiffs effective relief. The motion to dismiss on the ground of failure to exhaust administrative remedies was, therefore, properly denied.

## II

The plaintiffs contend that our public assistance statutes require that children of AFDC recipients "shall be supported in a home in this state, suitable for [their] upbringing"; General Statutes § 17-85 (a); and that these children shall receive aid sufficient to be supported "in health and decency." General Statutes

§ 17-82d. The trial court essentially endorsed this view, concluding that §§ 17-85 (a) and 17-82d "forbid an arbitrary period of 100 days for those homeless," as the regulation provides. We disagree with this interpretation of these statutes and conclude that the regulation is not in conflict with them.

The trial court concluded that the commissioner could not promulgate a regulation that disregards "the legislature's mandate that support be adequate for the relative and dependent child to live in 'health and decency' in 'a home . . . which such relative maintains as his/her own.' " The phrase "health and decency" refers to § 17-82d (a),[12] which provides that the commissioner,

---

[12] "[General Statutes] Sec. 17-82d. INVESTIGATIONS. GRANT OF AID. INCOME DISREGARD FOR FULL TIME STUDENTS. ASSET LIMITS. (a) The commissioner, upon receipt of an application for aid, shall promptly and with due diligence make an investigation, such investigation to be completed within forty-five days after receipt of the application or within sixty days after receipt of the application in the case of an application in which a determination of disability must be made. If an application for an award is not acted on within forty-five days after the filing of an application, or within sixty days in the case of an application in which a determination of disability must be made, the applicant may apply to the commissioner for a hearing in accordance with sections 17-2a and 17-2b. The commissioner shall grant aid only if he finds the applicant eligible therefor, in which case he shall grant aid in such amount, determined in accordance with levels of payments established by the commissioner, as is needed in order to enable the applicant to support himself, or, in the case of aid to dependent children, to enable the relative to support such dependent child or children and himself, in health and decency, including the costs of such medical care as he deems necessary and reasonable, not in excess of the amounts set forth in the various fee schedules promulgated by the commissioner of income maintenance for medical, dental and allied services and supplies or the charges made for comparable services and supplies to the general public, whichever is less, and the cost of necessary hospitalization as is provided in section 17-312, over and above hospital insurance or other such benefits, including workers' compensation and claims for negligent or wilful injury. The commissioner, subject to the provisions of subsection (b) of this section, shall in determining need, take into consideration any available income and resources of the individual claiming assistance. The commis-

if the applicant is eligible, "shall grant aid in such amount, *determined in accordance with levels of payments established by the commissioner,* as is needed in order to enable the applicant to support himself, or, in the case of aid to dependent children, to enable the relative to support such dependent child or children and himself, *in health and decency* . . . . " (Emphasis added.) This standard of support is applicable to all those seeking aid from DIM, not only to AFDC recipients, and is not specifically related to housing as compared to other necessities of life. Another statute, General Statutes § 17-12o,[13] specifically addresses the need for shelter and provides for "a special need payment of fifty dollars per month, for shelter costs, under the aid to families with dependent children program." Both §§ 17-82d and 17-12o impose limits on the amount to be paid to an AFDC family under the programs established, § 17-82d restricting payments for any applicant to the "levels of payments established by the commissioner" and § 17-12o providing a monthly shel-

sioner shall make periodic investigations to determine eligibility and may, at any time, modify, suspend or discontinue an award previously made when such action is necessary to carry out the provisions of this chapter. The parent or parents of any child for whom aid is received under the provisions of part II of this chapter, and any beneficiary receiving assistance under part III of this chapter, shall be conclusively presumed to have accepted the provisions of section 17-83e, 17-83f and 17-83g."

[13] "[General Statutes] Sec. 17-12o. SPECIAL NEED PAYMENT PROGRAM. ELIGIBILITY. REGULATIONS. The department of income maintenance shall establish a program to provide, on and after April 1, 1989, a special need payment of fifty dollars per month, for shelter costs, under the aid to families with dependent children program, the state program established under section 17-83o and the general assistance program. The commissioner shall adopt regulations, in accordance with the provisions of chapter 54 to prescribe the eligibility criteria for participation in the program, the application process and the method of providing the special need payment. The regulations shall limit eligibility for the special need payment to applicants or recipients under such programs whose shelter costs are equal to or greater than fifty per cent of their income, and who are not residing in public housing or receiving a federal, state or local housing subsidy."

ter cost subsidy of only fifty dollars. Neither of these statutes is related to emergency housing or the duration of its availability.

The reference of the court to "a home . . . which such relative maintains as his/her own" concerns the following provision of § 17-85,[14] upon which the plaintiffs

---

[14] "[General Statutes] Sec. 17-85. ELIGIBILITY. CONSIDERATION OF STEP-PARENT'S INCOME. (a) Except as provided in this section, any relative having a dependent child or dependent children, who is unable to furnish suitable support therefor in his own home, shall be eligible to apply for and receive the aid authorized by this part, for such dependent child or children, and to meet such relative's own needs, and any pregnant woman not otherwise eligible under this part, who would become eligible for such aid upon the birth of her child, shall be eligible to apply for and receive the aid authorized by this part, provided eligibility for any such pregnant woman shall commence no earlier than three months prior to the anticipated month of delivery. Such relative or pregnant woman shall be eligible for aid under this part if he or she has not made, within twenty-four months prior to the date of application for aid, an assignment or transfer or other disposition of property for less than fair market value for the purpose of establishing eligibility for benefits or assistance under this section if such relative or pregnant woman is to be supported wholly or in part under the provisions of this part; provided ineligibility because of such disposition shall be imposed only against the transferor and shall continue only for either (1) twenty-four months after the date of disposition or (2) that period of time from the date of disposition over which the fair market value of such property, less any consideration received in exchange for its disposition, together with all other income and resources, would furnish support on a reasonable standard of health and decency, whichever period is shorter, except that in any case where the uncompensated value of disposed of resources exceeds twelve thousand dollars, the commissioner of income maintenance shall provide for a period of ineligibility based on the uncompensated value which exceeds twenty-four months; and provided no needy dependent child shall be deemed ineligible for assistance by reason of any such transfer or other disposition of property by a relative. Any such disposition shall be presumed to have been made for the purpose of establishing eligibility for benefits or assistance unless the individual furnishes convincing evidence to establish that the transaction was exclusively for some other purpose. Each such dependent child shall be supported in a home in this state, suitable for his upbringing, which such relative maintains as his own. Aid shall not be denied any such dependent child on the ground that such relative is not a citizen of this state or of the United States.

"(b) The income of a stepparent living in the same home as a dependent child or dependent children shall be considered, in accordance with federal

principally rely: "Each such dependent child shall be supported in a home in this state, suitable for his upbringing, which such relative maintains as his own." The court viewed this provision as a "clear mandate," requiring DIM to provide emergency housing for the plaintiffs until they were placed in "permanent homes." The court concluded, therefore, that this provision overrides the restriction in § 17-82d limiting aid for an eligible applicant to the amount "determined in accordance with levels of payments established by the commissioner."

This interpretation of the provision of § 17-85 relied upon by the plaintiffs wholly ignores the context in which it is placed. Section 17-85 is entitled "Eligibility. Consideration of stepparent's incomes." The first, second, third and fifth sentences of subsection (a) set forth various conditions relating solely to the eligibility of AFDC recipients, and subsection (b) similarly establishes an additional eligibility criterion. Not only the statutory construction principle of noscitur a sociis,[15] but also the improbability that the legislature, without any history of such intention, would have placed a provision of such overwhelming fiscal and social significance, if given the impact attributed by the trial court, in a statute purporting to relate only to AFDC eligibility, persuade us that the provision involved, the fourth sentence of subsection (a), must also have been intended as an eligibility condition. Its purpose is to require that, when AFDC payments are made to a relative for a dependent child, the relative must support the child in a suitable home maintained by the relative. Unless the relative applying for AFDC is willing and able to fulfill that condition, aid cannot

law and regulations, in determining dependency pursuant to section 17-82 and in determining need and level of payment pursuant to section 17-82d."

[15] Translation: "One is known by his companions." Ballentine's Law Dictionary (3d Ed.).

be granted. This provision corresponds closely to a requirement of the definition of "dependent child" in General Statutes § 17-82[16] that such a child be living with a relative "in a place of residence maintained by one or more of such relatives as his or their own home." The latter phrase is identical to one of the conditions established by 42 U.S.C. § 606 (e) (1)[17] in defining "emergency assistance to needy families with children" and appears as a condition of eligibility for AFDC recipients in the statutes of many states.[18]

[16] "[General Statutes] Sec. 17-82. DEFINITIONS. When used in this chapter the following terms have the meanings herein assigned: 'Commissioner' means the commissioner of income maintenance; 'dependent child' means a needy child under the age of eighteen, or under the age of nineteen and in full-time attendance in a secondary school or in the equivalent level of vocational or technical training if, before he attains age nineteen, he may reasonably be expected to complete the program of such secondary school or such training, as provided by federal law, who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle or aunt, or any other relative approved by the commissioner in a place of residence maintained by one or more of such relatives as his or their own home; 'beneficiary' means any adult or minor child receiving assistance under the provisions of this chapter; 'local officer' means the public official charged with administration of public assistance in any town, city or borough."

[17] Title 42 of the United States Code § 606 provides in part: "(e) (1) The term 'emergency assistance to needy families with children' means any of the following, furnished for a period not in excess of 30 days in any 12-month period, in the case of a needy child under the age of 21 who is (or, within such period as may be specified by the Secretary, has been) living with any of the relatives specified in subsection (a) (1) of this section in a place of residence maintained by one or more of such relatives as his or their own home, but only where such child is without available resources, the payments, care, or services involved are necessary to avoid destitution of such child or to provide living arrangements in a home for such child, and such destitution or need for living arrangements did not arise because such child or relative refused without good cause to accept employment or training for employment——"

[18] Ariz. Rev. Stat. Ann. § 46-101 (1989); Ga. Code Ann. § 49-4-101 (1989); Hawaii Rev. Stat. § 346-71 (1989); Ind. Stat. Ann. § 12-1-7-1 (Burns 1989); Kan. Stat. Ann. § 39-702 (1989); La. Rev. Stat. Ann. § 46:231 (West 1989).

Even if we were to take the view expressed by the trial court that the provision of § 17-85 relied upon imposed some obligation on the part of the commissioner to arrange that "[e]ach . . . dependent child shall be supported in a home in this state, suitable for his upbringing" maintained by a relative, we would disagree with the further conclusion of the court that this provision is not subject to the limitation contained in § 17-82d (a) that the amount of aid to be granted be "determined in accordance with levels of payments established by the commissioner." There is no reason to suppose that emergency housing, which is provided by payments directly to those who operate the motels and other facilities occupied by AFDC recipients, is not subject to the restrictions established by the commissioner on the amount of such aid to be furnished, the 100 day limitation. The commissioner is authorized by General Statutes § 17-2 (a)[19] to determine the standard

[19] "[General Statutes] Sec. 17-2. DUTIES. STANDARD OF NEED FOR AID TO DEPENDENT CHILDREN PROGRAM, STATE PROGRAM FOR NEEDY STUDENTS AND FAMILY CASES UNDER THE GENERAL ASSISTANCE PROGRAM. (a) The commissioner of income maintenance shall administer the program of aid to families with dependent children and the program of state supplementation to the Supplemental Security Income Program provided for by the Social Security Act and state law. He may delegate any of his powers and authority to any deputy, assistant, investigator or supervisor, who shall have, within the scope of the power and authority so delegated, all of the power and authority of the commissioner of income maintenance. He shall, at least annually compute, after adequate study, a redetermination and such revisions to all components of the standards of need for the several programs administered by the department so as to reflect changes in living costs using the current federal Regional Consumer Price Index, and as shall be necessary to carry out the requirements of state and federal law and shall report his findings to the general assembly. He shall make a reinvestigation, at least every twelve months, of all cases receiving aid from the state and he shall maintain all case records of the several programs administered by the department of income maintenance so that such records show, at all times, full information with respect to eligibility of the applicant or recipient. In the determination of need under any public assistance program, such income or earnings shall be disregarded as federal law requires, and such income or earnings may be disregarded as federal law permits.

of need for AFDC recipients annually, subject to the legislative directives contained in § 17-2 (b).[20] Because her determination cannot be implemented except through the appropriation process, it is ultimately the legislature that controls the amount of aid available. "There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need . . . ." *King* v. *Smith,* 392 U.S. 309, 318, 88 S. Ct. 2128, 20 L. Ed. 2d 1118 (1968); see *Quern* v. *Mandley,* 436 U.S. 725, 738, 98 S. Ct. 2068, 56 L. Ed. 2d 658 (1978).

The plaintiffs cite no state or federal statute requiring the commissioner to establish an emergency housing program or requiring her to provide such housing for a period greater than 100 days. They maintain, nevertheless, that, because DIM chose to create such a program as a special need and originally set 180 days as the maximum period, emergency housing must remain available for that time and even longer if a permanent home has not been found.[21] They argue also

The commissioner shall encourage and promulgate such incentive earning programs as are permitted by federal law and regulations.

"(b) On July 1, 1985, the commissioner shall increase the standard of need under the program of aid to families with dependent children, the state program established pursuant to section 17-83o and for family cases under the general assistance program by four and three-tenths per cent over the standard for the fiscal year ending June 30, 1985, provided the commissioner shall apply the appropriate disregards. On July 1, 1988, and annually thereafter, the commissioner shall increase the standard of need over that of the previous fiscal year under the program of aid to families with dependent children, the state program established pursuant to section 17-83o and for family cases under the general assistance program by the percentage increase, if any, in the most recent calendar year average in the consumer price index for urban consumers over the average for the previous calendar year, provided the annual increase, if any, shall not exceed five per cent."

[20] See footnote 19, supra.

[21] The trial court enjoined the commissioner from enforcing the regulation and removing the plaintiffs from emergency housing "except to place them in permanent homes."

that because emergency housing is provided as "in kind assistance" rather than in a fixed dollar amount, like the "basic needs" payment made pursuant to § 17-82d, it is not subject to the restriction of that section that aid be granted only in accordance "with levels of payments established by the commissioner."[22] Both these contentions overlook General Statutes § 17-82g,[23] which

[22] The dissenting opinion advances a related argument, that "the commissioner's discretion in determining the level of payment of an applicant is controlled by what is needed to enable the applicant to support himself and his child or children in health and decency." The opinion relies upon the provision of General Statutes § 17-82d (a) requiring the commissioner to "grant aid in such amount, determined in accordance with levels of payments established by the commissioner, *as is needed* in order to enable the applicant to support himself [and his dependent children] 'in health and decency.' " (Emphasis added.) No challenge apparently is being made to the authority of the commissioner to determine the "standards of need for the several programs administered by the department" pursuant to General Statutes § 17-2 (a) or to the legislative ratification thereof implicit in the annual appropriations for those purposes. The opinion ignores the specific limitation in § 17-2 (b) of increases in AFDC payments under this standard of need to annual increases of 5 percent. It also overlooks General Statutes § 17-82g, which stipulates that payments of public assistance be made "within available department of income maintenance appropriations."

[23] "[General Statutes] Sec. 17-82g. FORM OF AID. DIRECT PAYMENT FOR CERTAIN SERVICES. PAYMENT OF 'CLEAN CLAIMS'. The aid granted under this chapter shall be in the form of money payments and shall be made by the commissioner within available department of income maintenance appropriations, directly to the applicant or other person entitled to receive the same at such regular intervals as the commissioner of income maintenance determines, provided the payments of the costs of medical care and such other charges in connection with the care and maintenance of a beneficiary as the commissioner deems necessary and reasonable may be made to the applicant or to those persons furnishing such services by the commissioner. Ninety per cent of clean claims for payments to persons furnishing such services shall be made no later than thirty days from receipt of the request for payment and ninety-nine per cent shall be made within ninety days of such receipt. For the purposes of this section 'clean claim' means a claim which can be processed without obtaining additional substantiation from the person furnishing such services or other person entitled to receive payment. A claim submitted by any such person who is under investigation for fraud or abuse shall not be considered a clean claim."

provides that "[t]he aid granted under this chapter [c. 302, entitled 'Public Assistance'] shall be in the form of *money payments* and shall be made by the. commissioner *within available department of income maintenance appropriations,* directly to the applicant or other person entitled to receive the same . . . . " (Emphasis added.) It is clear under this statute that *all* expenditures for the benefits or programs established by this "Public Assistance" chapter, which include AFDC payments, are limited to the appropriations made for them by the legislature, whether these expenditures are made in the form of payments directly to those eligible for the benefit or to those who furnish such benefit, as in the case of emergency housing. The commissioner is given whatever authority might be necessary to conform to § 17-82g by decreasing the "level of certain assistance . . . programs when necessary to correct an inequity or to comply with state or federal law or regulation." General Statutes § 17-82n.[24]

We conclude that the trial court's reliance upon § 17-82d (a) and § 17-85 (a) was misplaced and that there is no statutory support for its decision.[25]

---

[24] "[General Statutes] Sec. 17-82n. CHANGE IN LEVEL OF ASSISTANCE PAYMENTS AUTHORIZED. The commissioner of income maintenance, notwithstanding any other provision of law, may selectively increase or decrease the level of certain assistance payments in any of the public assistance programs when necessary to correct an inequity or to comply with state or federal law or regulation. Nothing in this section shall be construed to permit the commissioner to increase or decrease the standards of assistance payments affecting all or most public assistance recipients in any category of public assistance."

[25] The trial court also relied upon General Statutes § 17-38a (a), which provides as follows: "PROTECTION OF CHILDREN FROM ABUSE. REPORTS REQUIRED OF CERTAIN PROFESSIONAL PERSONS. WHEN CHILD MAY BE REMOVED FROM SURROUNDING WITHOUT COURT ORDER. (a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe

## III

In the declaratory judgment accompanying the injunction against enforcement of the 100 day limit on emergency housing, the trial court held that limitation to violate provisions of the third,[26] ninth[27] and fourteenth[28] amendments to our federal constitution and article eighth, § 1[29] and § 4[30] of our state consti-

---

environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

This general statement of the goals of our child welfare laws, although valuable as an aid in construing ambiguous provisions of such statutes, creates no rights beyond those specifically provided by the statutes intended to implement that statement of policy. See *Black* v. *Beame,* 550 F.2d 815, 817 (2d Cir. 1977). In no manner can it be deemed to override the express limitations on the amount of public assistance to be provided by the commissioner in such statutes as General Statutes §§ 17-82d (a) and 17-82g.

[26] The United States constitution, amendments, article III, provides: "No Soldier shall, in time of peace, be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."

The plaintiffs in this case have not explained how this provision applies to emergency housing, nor has the trial court articulated its reliance thereon. Accordingly, we do not address this provision.

[27] The United States constitution, amendments, article IX, provides: "The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people." Neither the plaintiffs nor the trial court has explained the application of this provision to emergency housing.

[28] The United States constitution, amendments, article XIV, provides: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[29] The Connecticut constitution, article eighth, § 1, provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

[30] The Connecticut constitution, article eighth, § 4, provides: "The fund, called the SCHOOL FUND, shall remain a perpetual fund, the interest of

tution. The court concluded that the federal constitutional provisions collectively created a constitutional right to family unity, which the 100 day limit threatened to disrupt, and that the state constitutional provisions established a fundamental right to public education, which would also be endangered if the plaintiffs were compelled to leave their present residences.

At trial the plaintiffs presented testimony concerning the predicament they and their children would face if emergency housing assistance should be terminated after the 100 day limit had expired. The court found that "members of this class have no social or familial network to fall back on when they face a financial crisis." Their AFDC grants pursuant to § 17-82d, which presumably reflect "all components of the standards of need," including housing costs; General Statutes § 17-2; were considered inadequate to provide decent private rental housing in the New Haven area. Although the court found that "there were more than enough vacant housing units in public housing projects in the New Haven area to house the entire group," for reasons that are unclear, these housing facilities were also deemed unavailable to the plaintiffs.[31]

which shall be inviolably appropriated to the support and encouragement of the public schools throughout the state, and for the equal benefit of all the people thereof. The value and amount of said fund shall be ascertained in such manner as the general assembly may prescribe, published, and recorded in the comptroller's office; and no law shall ever be made, authorizing such fund to be diverted to any other use than the encouragement and support of public schools, among the several school societies, as justice and equity shall require." Neither the plaintiffs nor the trial court have explained their reliance on this provision in relation to the issues in this appeal.

[31] The dissenting opinion relies upon this finding of the trial court to warrant a remand for the purpose of considering whether relief to the plaintiffs should be granted by making vacant units in public housing available to them. The opinion also suggests that the commissioner of the department of housing be brought into the case by virtue of the duty imposed upon him by General Statutes § 8-345 (a) to "implement and administer a program of rental assistance for low-income families living in privately-owned rental housing." This duty, however, is subject to the proviso of

Several plaintiffs testified that after being offered governmentally subsidized housing units, apparently pursuant to General Statutes §§ 8-345[32] and

§ 8-345 (d) that "[n]othing in this section shall give any person a right to continued receipt of rental assistance at any time that the program is not funded." Similarly, the opinion would remand the case to the trial court for joinder of the commissioner of the department of human resources, who is authorized by General Statutes § 17-31v, "upon application of any public or private organization or agency, [to] make grants, *within available appropriations,* to develop and maintain programs for emergency shelter services for homeless individuals." (Emphasis added.) The plaintiffs' action and the trial court's judgment is directed solely against the defendant commissioner of the department of income maintenance. At no time, even on appeal, have the plaintiffs asserted any claims against those agencies in charge of public housing, against the housing commissioner, or against the human resources commissioner. They are not necessary parties in the action, because the claims raised in the complaint against the commissioner of the department of income maintenance can be properly resolved so far as she is concerned without their presence. *Sturman* v. *Sachs,* 191 Conn. 1, 6–7, 463 A.2d 527 (1983). If we were to conclude that the absent commissioners were necessary or indispensable parties, we would be required to remand the case with direction to dismiss the suit for lack of jurisdiction.

[32] "[General Statutes] Sec. 8-345. RENTAL ASSISTANCE FOR LOW-INCOME FAMILIES LIVING IN PRIVATELY-OWNED RENTAL HOUSING AND ELDERLY PERSONS RESIDING IN STATE-ASSISTED RENTAL HOUSING FOR THE ELDERLY. REGULATIONS. REPORT. (a) The commissioner of housing shall implement and administer a program of rental assistance for low-income families living in privately-owned rental housing and elderly persons who reside in state-assisted rental housing for the elderly. For the purposes of this section, a low-income family is one whose income does not exceed sixty per cent of the median family income for the area of the state in which such family lives, as determined by the commissioner.

"(b) Housing eligible for participation in the program shall comply with applicable state and local health, housing, building and safety codes.

"(c) In addition to an element in which rental assistance certificates are made available to qualified tenants, to be used in eligible housing which such tenants are able to locate, the program may include a housing support element in which rental assistance for tenants is linked to participation by the property owner in other municipal, state or federal housing repair, rehabilitation or financing programs. The commissioner shall use rental assistance under this section so as to encourage the preservation of existing housing and the revitalization of neighborhoods or the creation of additional rental housing.

"(d) Nothing in this section shall give any person a right to continued receipt of rental assistance at any time that the program is not funded.

8-345a,[33] they had found the units assigned to them already rented, uninhabitable or boarded up. Several expert witnesses testified concerning the detrimental effects that the lack of permanent housing had upon the interpersonal relationships among family members and the plight of children forced to change their residences frequently.

The commissioner presented testimony that the current policy of the department of human resources was "to offer shelter to any family that needed it" and that AFDC recipients who had remained in emergency housing for more than 100 days would be offered shelter facilities by that agency.[34] The court apparently credited this testimony, finding that the defendant had "proposed to move some of the plaintiffs to shelters in Derby or Torrington." The plaintiffs also concede that they were offered shelter facilities in towns some distance away from New Haven. The court concluded, however, that to require the plaintiffs to move so far from New Haven would necessitate transfers of the children to other schools and that contacts with the facilities and agencies presently providing medical treatment, existing employment or job training would be interrupted

"(e) The commissioner shall adopt regulations in accordance with the provisions of chapter 54 to carry out the purposes of this section. The regulations shall establish maximum income eligibility guidelines for such rental assistance and criteria for determining the amount of rental assistance which shall be provided to eligible families and elderly persons.

"(f) The commissioner shall submit to the general assembly, on or before February 5, 1988, an analysis and evaluation of the operation and effectiveness of the program authorized under this section."

[33] "[General Statutes] Sec. 8-345a. EMERGENCY RENTAL ASSISTANCE FOR AFDC ELIGIBLE FAMILIES. The commissioner of housing shall provide emergency rental assistance for AFDC eligible families living in hotels and motels as a component of the program for rental assistance established under section 8-345."

[34] The dissenting opinion overlooks this undisputed testimony in implying that the termination of emergency housing for the plaintiffs means that they will be "put out on New Haven streets."

and seriously risk the welfare of the plaintiffs and their children. The court also found that, because the shelter facilities offered were "communal," with the family unit sharing many facilities with other families, they lacked privacy and "this enforced intimacy with strangers frequently produces stress, anxiety and friction between the occupants."

## A

"The integrity of the family has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska,* [262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)], the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma,* [316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942)], and the Ninth Amendment, *Griswold* v. *Connecticut,* 381 U.S. 479, 496, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (Goldberg, J., concurring)." *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 284, 455 A.2d 1313 (1983). All of the cases cited for this proposition, however, involve interference by the state in such private family matters as the custody and education of children or procreation. The financial circumstances of these plaintiffs, which are the root cause of their inability to obtain "permanent" homes, have not been produced by any state action, an essential requirement for invocation of the due process clauses of both our federal and state constitutions. *Harris* v. *McRae,* 448 U.S. 297, 316–17, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S. 917, 101 S. Ct. 39, 65 L. Ed. 2d 1108 (1980); *Lloyd Corporation* v. *Tanner,* 407 U.S. 551, 567, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972); *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 61–63, 469 A.2d 1201 (1984); *Lockwood* v. *Killian,* 172 Conn. 496, 501, 375 A.2d 998 (1977).

The plaintiffs do not claim that the commissioner was constitutionally obliged to establish an emergency housing program or that such a program, once created, was required to have a constitutionally prescribed duration. They argue, nevertheless, that, because the commissioner "took one helpful action—providing emergency housing—and then another shattering one—revoking availability of such housing even if individuals had no alternative place to live," her policy amounts to one whose direct effect is to intrude on choices concerning family arrangements. The United States Supreme Court has declared, however, that "[t]he prospective right to support payments, and the child's expectations with respect to the use of such funds, are clearly subject to modification by law, be it through judicial decree, state legislation, or congressional enactment." *Bowen* v. *Gilliard*, 483 U.S. 587, 607, 107 S. Ct. 3008, 97 L. Ed. 2d 485 (1987). The court has upheld actions of the state affecting family living arrangements by changes in support payments so long as they have a rational basis. Id. (federal AFDC statute requiring that a portion of the payments by a non-custodial parent for support of a child living with an AFDC family be treated as income to the family unit upheld); *Lyng* v. *Castillo*, 477 U.S. 635, 106 S. Ct. 2727, 91 L. Ed. 2d 527 (1986) (amendments affecting the federal food stamp program that distinguish between close relatives, more distant relatives and nonrelatives who share a single household in respect to the distribution of food stamps upheld); *Dandridge* v. *Williams*, 397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491, reh. denied, 398 U.S. 914, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970) (state maximum grant limit regardless of size of family and actual need upheld). "But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge* v. *Williams*, supra, 487.

We agree with the commissioner that establishment of the emergency housing program created no constitutional right to its continued existence on the ground that its discontinuance or a reduction in the period of its availability is likely to affect family living arrangements. The plaintiffs in this case, unlike those in the cases cited above in which changes in laws relating to the distribution of welfare benefits also have serious effects upon the recipient families, have raised no equal protection of the laws claim. We do not perceive how the absence of such a claim, which does serve to differentiate this case from the cases cited, can be said to enhance the plaintiffs' claim to constitutional protection.

### B

The trial court found that terminating emergency housing and offering as an alternative only group shelter housing distant from the New Haven area, where the children of these plaintiffs have been attending school, would violate their state constitutional right to education because of the harmful effect upon them of frequent school transfers. In *Horton* v. *Meskill,* 648–49, supra, this court construed article eighth, § 1 of our state constitution to create a fundamental right to elementary and secondary public school education, entitling pupils in those schools to the equal enjoyment of that right. The plaintiffs claim that the right recognized in *Horton* will be violated if they are forced to move from their present housing facilities to distant towns where their children would attend school for a few weeks or months only to change schools again when permanent homes are found for them.

We do not believe that the burden imposed on the state by our decision in *Horton* to ensure approximate

equality in the public educational opportunities offered to children throughout this state; id., 651–52; despite variations in funding by the towns, includes any guaranty that children are entitled to receive their education at any particular school or that the state must provide housing accommodations for them and their families close to the schools they are presently attending. The undoubted hardship imposed upon the children of these plaintiffs from the lack of affordable housing near the schools where they now are being educated cannot be disputed. It results, however, from the difficult financial circumstances they face, not from anything the state has done to deprive them of the right to equal educational opportunity. When the plaintiffs were displaced from their former homes, the commissioner was not obligated to provide emergency housing for them located near their former homes so that their children could continue to attend the same schools. The fact that such housing facilities have been made available for a limited period does not create any constitutionally protected right in the plaintiffs to continue to occupy their present residences indefinitely.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the commissioner.

In this opinion HEALEY, CALLAHAN, COVELLO, HULL and SANTANIELLO, Js., concurred.

GLASS J., dissenting. Because I disagree with the majority's determination that the trial court erred in its declaration that the regulation adopted by the Connecticut department of income maintenance (DIM) setting a 100 day per calendar year limit on emergency housing was contrary to General Statutes § 17-82d, and therefore unenforceable, I respectfully dissent.

Pursuant to the program of Connecticut's Aid To Families With Dependent Children (AFDC), DIM

makes cash payments for emergency housing to housing providers on behalf of recipient families. As noted by the majority, "[i]n addition to the payments made to AFDC recipients for food, shelter and other necessities in the form of a basic grant equal to the 'standard of need' as determined pursuant to General Statutes § 17-2, an emergency housing program has been established by the commissioner [of the department of income maintenance] as a 'special needs' program, under which payments are made to those who provide temporary housing to families that have lost their former homes and are unable to find housing they can afford in the marketplace. The maximum period for which these emergency housing payments would be made was 180 days until May, 1988, when it was reduced to 100 days." The majority states further that the "eight plaintiffs who represent the class and their children resided in various motels and similar facilities in the New Haven area to which they had been assigned by DIM after being displaced from their former homes. After each of these plaintiffs had been notified that the 100 day period for which emergency housing had been provided to them would terminate on April 11, 1989, they commenced this action on April 10, 1989, claiming that they had no reasonable alternative but to remain at the emergency housing locations where they were situated, because they had been unable to find permanent housing they could afford."

These poor people have come to the court seeking some type of relief. In construing § 17-82d (a) in a manner that effectively rejects their plea for help, the majority adopts the argument of DIM that the state is not responsible for the consequences of poverty. But neither is Connecticut callous to the consequences of poverty. The legislature has provided the statutory basis for help by mandating that DIM provide assistance "as is needed" under § 17-82d (a). In addition, the

legislature has honored DIM's requests for deficiency appropriations. Nonetheless, the majority returns these poor people back to the same emergency status that they were in when this action was commenced on April 10, 1989.

"A statute should be construed so that no word, phrase or clause will be rendered meaningless." *C. White & Son, Inc.* v. *Rocky Hill,* 181 Conn. 114, 122, 434 A.2d 949 (1980). "[W]e must consider the statutory scheme as a whole, giving meaning to every section, and assuming no word or phrase to be superfluous." *Berger* v. *Tonken,* 192 Conn. 581, 589, 473 A.2d 782 (1984). In adopting the argument of DIM that the commissioner shall grant aid in such amount, "determined in accordance with levels of payments established by the commissioner," the majority reads this part of § 17-82d (a) as if it were disconnected from the remaining part of the sentence in the statute. The pertinent portion of the sentence in § 17-82d (a), concerning the discretionary level of aid to be granted to an applicant by the commissioner, provides that the commissioner "shall grant aid only if he finds the applicant eligible therefor, in which case *he shall grant aid in such amount,* determined in accordance *with levels of payments established by the commissioner, as is needed in order* to enable the applicant to support himself, or, in the case of aid to dependent children, *to enable the relative to support such dependent child or children and himself, in health and decency* . . . ." (Emphasis added.) DIM determined that because of the plaintiffs' emergency housing requirement they were eligible for "special needs" assistance for housing. The majority does not challenge this determination. In fact, absent a determination of need over and above basic or "standard need," the plaintiffs would not be eligible for, nor awarded, "special needs" assistance. Given the fact that the plaintiffs have been awarded "special

needs" assistance, a fair reading of the sentence in focus indicates that the commissioner's determination of the "level of payments" must be established "as is needed" by the applicants. Thus, the commissioner's discretion in determining the level of payment to an applicant is controlled by what is needed to enable the applicant to support himself and his child or children in health and decency. In sum, the majority's narrow construction of this pertinent part of § 17-82d (a) disregards the "as is needed" phrase in the sentence in focus in the statute.

Furthermore, the trial court found that "[a]t the time this matter was heard, there were 127 families in emergency housing in the New Haven area. Emergency housing costs $2000 for 30 days. For this sum, the landlord also provides the recipients counseling and support services. Ironically, at the same time many of these families were facing eviction and the alternatives of shelters, the street, or the generosity of relatives and friends, there were more than enough vacant housing projects in the New Haven area to house the entire group." The majority, after recognizing the trial court's ironic observation, concludes that "for reasons that are unclear, these housing facilities were also deemed unavailable to the plaintiffs."

In setting aside the judgment of the trial court, the majority does not suggest or indicate what is to happen to the eight plaintiffs and their children or the 127 families in emergency housing in the New Haven area at the time of the hearing. Certainly, having the plaintiffs live in "motels" and other "similar facilities" at $2000 per month, or put out on New Haven streets is not the solution to their problem. The same emergency housing "special need" exists today, just as acutely as it existed when the trial judge issued the temporary and permanent injunctions. As the majority recognizes, "the trial judge was faced with the reality that, when

the case came before him, the eight plaintiffs who represent the class were subject to termination of their emergency housing benefits immediately. . . . " Although the legislature has responded favorably to DIM's requests for deficiency appropriations, nonetheless, that part of the deficiency appropriation resulting from the payments of $2000 per month for emergency housing for motels and other similar facilities and counseling is logically inconsistent with the trial court's finding that, at the time of the hearing, there were more than enough vacant housing units in public housing projects in the New Haven area to "house the entire group."

Therefore, although I would uphold the trial court's determination that the DIM regulation setting a 100 day per calendar year limit on emergency housing is contrary to § 17-82d, and therefore unenforceable, nonetheless, because I believe that the trial court's order is too broad, I would return this case to the trial court for consideration of its finding that there was enough public housing in the New Haven area "to house the entire group." The trial court's order maintains the status quo without direction for some immediate, permanent relief based on the court's finding of available public housing in the New Haven area. Additionally, since DIM argues that under General Statutes § 8-345a the commissioner of the department of housing is authorized to administer a program of rental assistance to recipients of assistance, and the department of human resources under General Statutes § 17-31v is authorized to provide grants and to advance security deposits on behalf of recipients of AFDC who reside in emergency housing in order to assist their relocation to permanent housing, the trial court should be directed to order these state agencies to be brought into the case to assist DIM in locating and funding permanent housing for "the entire group" in the New

Haven area. There is no reason to assume that administrative relief would not be afforded to other members of the plaintiffs' class needing relief from emergency housing, and, therefore, there would be no need to resort to the court for assistance.

Because I believe that the judgment of the trial court was correct except in regard to its broad order of relief, I dissent.