[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This declaratory judgment action was brought on April 28, 1989 by seventeen named plaintiffs, including fifteen black, Hispanic and white public school students who lived in Hartford and who were attending various elementary schools, middle schools and high schools in the Hartford public school system, as well as two white children who lived with their parents in the town of West Hartford and were enrolled in one of its elementary schools. The defendants named in the original complaint were the incumbent governor, William A. O'Neill, or his successors in that office, the state board of education, its individual members, the state commissioner of education, who was then Gerald N. Tirozzi, the state treasurer and the state comptroller, as well as their successors in those offices. CT Page 4110
The complaint (¶ 30) states that school children throughout Connecticut, "including the City of Hartford and its adjacent suburban communities, are largely segregated by race and ethnic origin." It alleges (¶¶ 36, 38) that Hartford public schools, because they have such a high proportion of students who are "at risk" of lower educational achievement, "operate at a severe educational disadvantage [which imposes upon them] enormous educational burdens [which have made them unable] to provide educational opportunities that are substantially equal to those received by schoolchildren in the suburban districts."
The plaintiffs also assert (¶ 45) that "[m]easured by the State's own educational standards . . . a majority of Hartford schoolchildren are not currently receiving even a `minimally adequate education.'" Paragraph 50 of the original complaint alleged that "[f]or well over two decades, the State of Connecticut, through [the defendants] and their predecessors, have been aware of: (i) the separate and unequal pattern of public school districts in the State of Connecticut and the greater Hartford metropolitan region; (ii) the strong governmental forces that have created and maintained racially and economically isolated residential communities in the Hartford region; and (iii) the consequent need for substantial educational changes, within and across school district lines, to end this pattern of isolation and inequality."
The plaintiffs claim (¶ 68) that the defendants "have the legal obligation under Article First, §§ 1 and 20, and ArticleEighth, § 1 of the Connecticut Constitution" to correct these "educational inequities" in the Hartford school system, and that (¶ 69) they also have the power under the state constitution and state statutes "to carry out their constitutional obligations and to provide the relief to which plaintiffs are entitled." They assert, nevertheless (¶ 70), that neither the Hartford school district nor the nearby suburban districts "have been directed by defendants to address these inequities jointly, to reconfigure district lines, or to take other steps sufficient to eliminate these educational inequities."
The plaintiffs' legal claims as stated in the first count (¶¶ 73-75) are that "[s]eparate educational systems for minority and non-minority students are inherently unequal [and that because] of the de facto racial and ethnic segregation between Hartford and the suburban districts, the defendants have failed to provide the plaintiffs with an equal opportunity to a CT Page 4111 free public education as required by Article First, §§ 1 and 20, and Article Eighth, § 1, of the Connecticut Constitution, to the grave injury of the plaintiffs." The second count (¶¶ 76-78) states that "[s]eparate educational systems for minority and non-minority students in fact provide to all students, and have provided to plaintiffs, unequal educational opportunities [and that because] of the racial and ethnic segregation that exists between Hartford and the suburban districts, perpetuated by the defendants and resulting in serious harm to the plaintiffs, the defendants have discriminated against the plaintiffs and have failed to provide them with an equal opportunity to a free public education as required by [the three state constitutional provisions referred to in the first count]."
The third count (¶ 79-80) claims that the same state constitutional guaranties have been violated by the defendants because they have maintained a public school district in the city of Hartford that is "severely educationally disadvantaged" in comparison to the suburban school districts, that fails to provide its schoolchildren with educational opportunities equal to those in suburban districts, and that fails to provide a majority of its students with a "minimally adequate education" based on the state's own standards. The fourth count (¶ 81-82) claims that the failure of the defendants to provide Hartford schoolchildren with equal educational opportunities pursuant to state statutes violates their due process rights under Article First, §§ 8 and 10, of the state constitution.
The defendants moved to strike the complaint for failure to state a claim upon which relief could be granted because, first, the plaintiffs' claims were not justiciable; second, unconstitutional state action had not been alleged; third, the plaintiffs had not alleged any causal connection between school district lines and educational performance; and, fourth, the existence of school districts which coincide with town boundaries did not violate constitutional standards. The court, in its memorandum of decision on the motion, Sheff v. O'Neill,1 Conn. L. Rptr. 640, 642 (1990), noted that the plaintiffs in this case were relying on the same state constitutional provisions that were invoked by the plaintiffs in Horton v. Meskill, 172 Conn. 615
(1977) (Horton I), in their successful challenge by way of a declaratory judgment action to the constitutionality of the state's system for financing public education.
The issue of justiciability raised by the defendants as the CT Page 4112 first ground for their motion to strike was based on the plurality opinion in Pellegrino v. O'Neill, 193 Conn. 670 (1984), which upheld the dismissal by the trial court of a declaratory judgment action challenging the constitutionality of the state's financing of the judicial system because it was a "political question which could not be adjudicated by judicial authority without violating the principle of separation of powers." Id., at 674. This court rejected the defendants' argument in support of their motion in part because of Judge Parskey's ruling in favor of the plaintiffs on the question of justiciability at the trial court level in Horton I, 31 Conn. Sup. 377, 389 (1974), but more particularly, in reliance on the "[j]urisprudential prudence" counselled by then Associate Justice Peters in the Pellegrino
dissent in which she stated that "the plaintiffs should not be deprived of the opportunity that was afforded to the plaintiffs in Horton v. Meskill, 172 Conn. 615, 376 A.2d 359 (1977), to make an evidentiary showing that the legislature has violated the state constitution . . ." and cautioned against prejudging the issue of justiciability "in the abstract" without a full hearing on the plaintiffs' claims, however "novel and complex" the constitutional questions might be. Pellegrino v. O'Neill, supra,193 Conn. 689, 692-93 (Peters, J., dissenting).
The second and third grounds for the motion to strike, which were the basis for the defendants' arguments that this court rule as a matter of law on the issues of state action and causation, were also rejected as an attempt to obtain a premature judicial determination of those disputed issues contrary to the general rule that the standard for testing the sufficiency of a complaint for declaratory judgment "is not whether the plaintiff is entitled to the declaratory relief he seeks in accordance with the theory he states, but rather, it is whether he is entitled to a declaration of rights at all under the allegations of his complaint." Sheff v. O'Neill, supra, 1 Conn. L. Rptr. 643. The fourth and final argument made by the defendants in support of their motion to strike, which was that an immediate ruling on the defendants' claim that the existence of school districts which coincide with town boundaries does not violate the state constitution would avoid a "meaningless" trial on the merits, was also rejected on the ground that it would be "inappropriate" for the court to consider or to decide any of the plaintiffs' constitutional claims prior to trial. Id., (citing United Statesv. Mississippi, 380 U.S. 128, 143 (1965)).
The defendants filed their answer to the plaintiffs' CT Page 4113 complaint on June 27, 1990 after the court's denial of their motion to strike, and also asserted seven special defenses based on both jurisdictional and substantive grounds. Their response to the first of the five introductory paragraphs of the complaint which states that the Hartford public schools are "all but overwhelmed" by the demands made upon them to educate the disproportionately large number of poor and minority students in a school system that is "racially and ethnically isolated" from the adjacent school districts, was that the paragraph was admitted "only insofar as it alleges that there is a relatively high concentration of children from poor families and black and Hispanic students" in the Hartford public schools compared to the public schools in most of the twenty-one towns surrounding Hartford.
They admit in paragraph 3 of their answer that Hartford students "as a whole do not perform as well on the State Mastery Test as do the students as a whole in some surrounding communities and that poor and minority children have the potential to become well-educated", but deny the plaintiffs' claim that the state, "by tolerating school districts sharply separated along racial, ethnic, and economic lines, has deprived the plaintiffs and other Hartford children of their [constitutional and statutory] rights to an equal educational opportunity, and to a minimally adequate education. . . ." They also admit (¶ 4) that "society benefits from racial, ethnic, and economic integration and that racial, ethnic and economic isolation may have some harmful effects", but deny that they have "failed to act effectively to provide equal educational opportunity to plaintiffs and other Hartford schoolchildren" as alleged by the plaintiffs.
It is also undisputed (¶ 33) that for the 1987-88 school year Hartford's total school population of 25,058 was the highest of all the towns in the metropolitan area and that the next largest school district in terms of enrollment was West Hartford with 7,424 students. The percentage of black and Hispanic students in the Hartford school system for that school year was 90.5%, followed by Bloomfield and Windsor with 69.9% and 30.8%, respectively.
The defendants admit (¶ 35) that the Hartford schools serve a greater proportion of students from backgrounds that put them "at risk" of lower educational achievement than the CT Page 4114 suburban school districts and that Hartford therefore has a "comparatively larger burden to bear in addressing the needs" of those children. They also acknowledge (¶ 36, Answer to Plaintiffs' Consolidated Amended Complaint, April 1, 1993) that such children have the capacity to learn and that although they impose "some special challenges" to the particular school system that is responsible for their education, neither the at risk children in Hartford nor their fellow students have been deprived of their right to an equal educational opportunity because of the additional "enormous educational burdens" that may have thereby been imposed upon the teachers and students of the Hartford schools as alleged by the plaintiffs.
It should be noted at this point in the court's review of the pleadings that the plaintiffs' "Statement of Facts" (designated as Part III of the complaint, ¶¶ 30-72) is divided into four sections, the first of which (Section A, ¶¶ 30-34), entitled "A Separate Education", contains the factual allegations upon which they base their claim that Hartford area public schools are "inherently unequal" because they are segregated de facto by race and ethnicity, and the second (Section B, ¶¶ 35-49), whose title is "An Unequal Education", states the factual basis for their claims that they have been deprived of an equal opportunity to a free public education (¶ 78), a minimally adequate education (¶ 80), and their due process rights (¶ 82) to equal educational opportunities under state law. The third section (¶¶ 50-66), entitled "The State's Longstanding Knowledge of These Inequities", gives a chronological account of various federal, state and local governmental reports, studies and recommendations dealing with the growing problem of racial segregation in the schools which begins in 1965 with a United States civil rights commission report to the state's education commissioner (¶ 51), and ends in April, 1989, the month in which this action was commenced, with a report issued by then Commissioner Tirozzi(Tirozzi II).
The assertions made by the plaintiffs in paragraphs 51-66
constitute the factual underpinnings for the allegations made in paragraph 50 of the original complaint, which were quoted earlier in this opinion, and which can be fairly summarized as stating that the defendants have long been aware of the conditions that gave rise to this action. It should be noted, however, that the CT Page 4115 plaintiffs' original claim that the state had a "role in segregated housing patterns" (Plaintiffs' Request for Leave to Amend Complaint, July 21, 1992, Record item #178) as suggested by the references made in the original complaint to "social policies pursued and/or accepted by the defendants" (¶ 47), "the strong governmental forces that have created and maintained racially and economically isolated residential communities" (¶ 50), and their failure "to afford meaningful racial and economic integration of housing within school zones and school districts" (¶ 71), were deleted at the request of the plaintiffs in order to limit their proof to "the important educational issues that are at the core of this case." Record item #178, supra.[1]
The defendants' answer generally admits the existence and authenticity of all the reports, studies and recommendations referred to in paragraphs 51-66, but denies (¶ 51) that the defendants "failed to take any appropriate action to address the concerns" voiced in those reports as alleged by the plaintiffs. As to paragraph 50 which generally alleges they were aware of the conditions complained of over a long period of time, they admit only that "state officials have, for some time, been aware of a trend by which the percentage of [minority] students in the Hartford Public Schools has been increasing."
The defendants admit that recommendations for legislation made by the state civil rights commission in 1966 which the plaintiffs allege would have given the State Board of Education (SBE) authority over school integration (¶ 53) were not adopted by the legislature and that a legislative proposal made by the commission in 1968 which would have provided for the creation of "educational parks" (¶ 55) was not enacted into law as well. They also admit (¶ 58) that although the Racial Imbalance Law, General Statutes § 10-226a et seq., was passed in 1969 and the legislature authorized the SBE to promulgate implementing regulations, the legislature failed to approve any regulations to implement the statute until 1980.
The defendants deny the paragraph of the complaint (¶ 59) alleging that from 1970 to 1982 "no effective efforts" were made by the defendants "fully to remedy the racial isolation and educational inequities . . . which were growing in severity during this period." They admit paragraphs 60 through 66 in which the plaintiffs identify CT Page 4116 and quote from various reports and policy statements issued by the SBE from 1983 to 1989 during the tenure of the defendant Tirozzi as commissioner, beginning with a "Policy Statement on Equal Educational Opportunity" (¶ 60, Plaintiffs' Exhibit 43)[2] in which the board stated that it "supports racial integration in Connecticut's schools and also recognizes the benefits of residential and economic integration in our state, as important to the quality of education and personal growth for all students in Connecticut."
The next report referred to in the complaint (¶ 61) was filed with the SBE on February 5, 1986 (PX 42) by an advisory committee to study the state's Racial Imbalance Law and noted (p. 14) that the reason minority children in the larger urban school districts did not perform well on statewide academic proficiency tests was "because they are poor and often extremely deprived, not because they are minority", and also indicated in its summary (p. 18) that "the board may wish to consider one or more of the following initiatives: programs that ensure students the highest quality instruction possible, voluntary interdistrict collaboration, expansion of magnet school programs and metropolitan districting."
Another policy statement that is identified and quoted in part in the complaint (¶ 62) was one prepared by the committee on racial equity for the SBE in January, 1988, entitled "A Report on Racial/Ethnic Equity and Desegregation in Connecticut's Public Schools" (Tirozzi I), which noted (PX 50, p. 8) that "achieving the goals to school desegregation and equal educational opportunity will require a major rethinking of Connecticut's public education system." The four recommendations made in the report (pp. 11, 18, 19) were that first, the state endorse the concept of "collective responsibility", second, that substantial financial incentives be made available to school districts "that plan and implement voluntary interdistrict programs and advance desegregation, racial balance and integrated education", third, that the Department of Education (DOE) provide technical assistance for the development and implementation of desegregation plans, and fourth, that the DOE "undertake broad-based planning with other agencies concerned with housing, transportation and other factors that contribute to segregation in the public CT Page 4117 schools, to find ways to counteract adverse influences on integration."
Paragraph 63 of the complaint refers to another report issued by Tirozzi in December, 1988, entitled "Poverty and the Department of Education" (PX 59), which is described as "an extensive analysis of Connecticut's Mastery Test results" and quotes one of its findings (PX 59, p. 4) to the effect that poverty as measured by one indicator, that of student participation in the free and reduced lunch program, has an important correlation with low achievement, and that the low achievement outcomes associated with that factor are intensified by geographic concentration. The preface to the report states that "[o]f U.S. cities with the highest child poverty rates, Hartford ranks second, New Haven sixth and Bridgeport eighth", and some of the other findings stated in the body of the report (p. 2) are that "[e]very other child in Hartford, New Haven and Bridgeport lives in poverty, [that the] fastest growing segment of Connecticut's population living in poverty is children under the age of five [and that such children are] more likely to be educationally at risk of school failure and dropping out before graduation than children from less impoverished homes."
The remaining paragraphs of the third section of the complaint (¶¶ 64-66) concerning the state's "longstanding knowledge" of the existence of the conditions which are the subject of this action refer to and quote from a report issued in April of 1989 (Tirozzi II), entitled "Quality and Integrated Education: Options for Connecticut" (PX 60, pp. 1, 3, 34) which noted that the initial report of January, 1988 (Tirozzi I), "documented an alarming degree of isolation" of poor and minority children in Hartford, and generally reaffirmed the findings that had been made as a result of the prior departmental studies. Paragraph 66 asserts that despite the state's "recognition of . . . the gravely adverse impact this isolation has on the educational opportunities afforded to plaintiffs and other other urban schoolchildren" the report stated (p. 34) that "[t]he actions recommended in this report are voluntary and incremental", and the defendants "have announced, that they intend to pursue [that] approach . . ."
The concluding section of the plaintiffs' statement of CT Page 4118 facts which is captioned "The State's Failure to Take Effective Action", as it appears in the original complaint (¶¶ 67-72), states (¶ 68) that it is the defendants' duty under the equal protection and education clauses of the state constitution "to correct [the] educational inequities [that] Hartford schoolchildren face" and (¶ 69) that they "have full power . . . to carry out their constitutional obligations and to provide the relief to which plaintiffs are entitled." As to the latter allegation, the defendants' answer leaves the plaintiffs to their proof "because the plaintiffs have failed to identify the specific remedial action they are seeking [and to] the extent that the plaintiffs are seeking to redraw school district lines, disassociating the school districts from the individual municipalities they serve, or they are seeking to require children to attend school in districts other than the district in which their parents live, vote and pay taxes, these defendants have no power to carry this out."
The last of the factual allegations of the complaint (¶ 72) challenges the adequacy of the state's funding of the "compensatory or remedial services" required by the Hartford school district to meet the educational needs of its students and raises an additional and independent constitutional claim that the legislative changes made in the statutory school financing system in response toHorton I have not been sufficient to redress the educational inequities that allegedly exist in Hartford. The defendants deny the plaintiffs' factual and legal claims in their answer, and in their second special defense (¶ 84), they assert that the decision in favor of the state on that issue in Horton v. Meskill, 195 Conn. 24 (1985) (Horton III) precludes them from raising it in this action by reason of the operation of the doctrine of stare decisis.
Four of the six other special defenses interposed by the defendants raise essentially jurisdictional issues as follows, first (¶ 83), that the doctrine of sovereign immunity bars this action because the plaintiffs have failed to plead facts sufficient to establish a constitutional violation, second (¶ 85), that matters of educational policy are committed exclusively to the General Assembly by article eighth, § 1 of the state constitution, third (¶ 86), that any judgment or order of the court that imposes affirmative obligations on the defendants requiring legislative CT Page 4119 implementation would violate the principle of separation of powers, and fourth (¶ 87), the court lacks jurisdiction because of the plaintiffs' failure to join the city of Hartford or its board of education or any of the suburban towns or their school boards as necessary parties to this action, "[t]o the extent the plaintiffs complain about matters which are committed by law" to the discretion of those municipalities or their boards of education. The sixth special defense (¶ 88) challenges the legal sufficiency of the complaint because the "[p]laintiffs have failed to allege . . . state action as a direct and sufficient cause of the conditions about which they are complaining [and paragraph 89, the seventh special defense, asserts that] the state, as a matter of law, has taken reasonable and appropriate steps to address the educational problems identified in [the] plaintiffs' complaint and the court may order nothing further."
In accordance with the court's scheduling order after its decision on the motion to strike, the pleadings were closed, and the parties then proceeded with discovery by way of interrogatories in order to narrow the factual issues for trial by resolving those that were essentially undisputed. Thereafter, on July 8, 1991, the defendants filed a motion for summary judgment based on their claims that, first, it was indisputable that the state had satisfied whatever affirmative duty was required of it under the constitution, second, the court's prior decision on the issue of state action should be reconsidered in the light of the intervening decision by the Supreme Court in Savage v.Aronson, 214 Conn. 256 (1990), and the affidavit by then commissioner Tirozzi filed in support of the motion as to that issue, and third, that the question of justiciability had been wrongly decided in favor of the plaintiffs by the court on the state's motion to strike.
The Tirozzi affidavit stated that with the exception of regional school districts, existing school district boundaries had not been materially changed in over eighty years, and that to his knowledge no child in Connecticut had ever been assigned to a school district in this state on the basis of race, national origin, socioeconomic status, or status as an "at risk" student, and that children have always been assigned to particular school districts on the basis of their town of residence. The plaintiffs argued in CT Page 4120 their brief in opposition to the motion (Record item #159, pp. 5-6) that proof of state action is not a necessary element of liability where de facto segregation is claimed because "it is the present condition of racial segregation in the region's schools that violates the Connecticut Constitution as a matter of law, and the harms that flow from the present condition of racial and economic segregation that in fact deprive Hartford area schoolchildren of their right to equality of educational opportunity [and the] intent of the state defendants is therefore immaterial."
The defendants' memorandum in support of the motion (Record item #150, p. 50) stated that Savage v. Aronson,
supra, 214 Conn. 256, "established that direct and harmful state action is necessary to support claims under the education provision in Article VIII, ¶ 1, as well as claims under the equal protection provisions of the state constitution [and that the court in that case] rejected claims under [the education clause] which are strikingly similar to the claims being made by the plaintiffs in the present case." In Savage, the trial court had found that the action of the department of income maintenance in terminating emergency housing for families receiving Aid to Families with Dependent Children (AFDC) "and offering as an alternative only group shelter housing distant from the New Haven area, where [their children] have been attending school, would violate their state constitutional right to education because of the harmful effect upon them of frequent school transfers." Id., 286.
The majority opinion in Savage acknowledged "[t]he undoubted hardship imposed upon the children of these plaintiffs from the lack of affordable housing near the schools where they are now being educated", but concluded nevertheless that their hardship resulted "from the difficult financial circumstances they face, not from anything the state has done to deprive them of the right to equal educational opportunity." Id., 287. The court's rejection of the plaintiffs' substantive due process claims was also based on its finding that their financial circumstances, "which are the root cause of their inability to obtain `permanent' homes, have not been produced by any state action, an essential requirement for invocation of the due process clauses of both our federal and state CT Page 4121 constitutions." Id., 284.
The defendants' claim that summary judgment should enter because state action of some kind must be found to exist before the constitutional issues raised by the plaintiffs may be considered, was rejected in part because of the court's prior ruling that they were entitled to a full hearing on the merits of their claims. Sheff v.O'Neill, 42 Conn. Sup. 172, 173 (1992). The court's memorandum of decision also noted that an issue that had neither been raised nor addressed in Horton I was present in this case, namely, whether the state's constitutional obligation to educate its schoolchildren required that a specific substantive level of education be provided to them, and the court was therefore required to define the scope and content of the constitutional provisions relied upon by the plaintiffs as was done by the New Jersey Supreme Court inAbbott v. Burke, 575 A.2d 359, 367-68 (N.J. 1990). Id., 175.
The court also relied on the Abbott decision as the basis for rejecting the defendants' claim that the evidence submitted in support of their motion established that the state had satisfied its affirmative constitutional duty by enacting "appropriate legislation" to deal with the problems of urban school districts and to address the special needs of their students because, as stated by the New Jersey court in Abbott, the scope of the judicial inquiry is not limited to the state's funding of its school districts but extends as well to the question of whether or not the state was providing a "minimally adequate education" for the children in the Hartford public schools as alleged by the plaintiffs. Id., 177-78. With respect to the defendants' request that the court reconsider its prior decision in favor of justiciability, the court declined to do so and treated that ruling as the law of the case because the issue had been correctly decided, and that in any event, the defendants' argument was repetitive. Id., 178-79.
After the court's denial of the motion for summary judgment and the assignment of the case for trial in December of 1992, the court determined that the issues of liability and remedy would not be bifurcated and that evidence would be received as to the relief sought by the plaintiffs, without prejudice, however, to the rights of CT Page 4122 interested parties to be heard at a separate remedial hearing, if necessary, should the plaintiffs prevail on their constitutional claims. See Horton III, supra,195 Conn. 46. Thereafter, over the course of thirty-five trial days beginning December 16, 1992 and ending February 26, 1993, approximately one thousand exhibits were introduced in evidence and the testimony of fifty-eight witnesses was received including the deposition testimony of four witnesses which were offered in evidence and admitted as full exhibits.
The plaintiffs, in their opening argument (Transcript, December 16, 1992, pp. 8-9), stated that their constitutional claims in this case were even stronger than those advanced successfully by the plaintiffs in Horton I,
namely, that education was a fundamental right and that every child has the right to an equal educational opportunity under the state constitution, because Article First, ¶ 20 of the constitution "expressly prohibits both segregation as well as discrimination [and that] de facto segregation is a form of segregation." The thrust of the defendants' argument (pp. 27-28) was that this was "not a school desegregation case [because there] is no past or present segregation to undo [nor was there any] evidence of wrongdoing on the part of the state [and that, on the contrary the] evidence [would] show the state has made serious efforts and is a leader in attempting to address these very serious problems."
The depositions that were admitted into evidence had all been taken by the plaintiffs, and the persons deposed were the defendant Tirozzi (PX 494), who had served as state commissioner of education from July 1, 1983 to October 1, 1991, Vincent Ferrandino (PX 493), who succeed him as commissioner, John Mannix (PX 495) who was chairman of the state board of education when he gave his testimony on October 1, 1992, and Robert Margolin (PX 506), an employee of the DOE since 1967 who had held various administrative positions and was serving as deputy commissioner of education at the time of his retirement in 1991. The plaintiffs' claim that the testimony of each of the deponents should be treated by the court as an admission against the state was denied, and after the court had ruled on the defendants' objections to some of the questions, the depositions were marked and admitted into evidence as CT Page 4123 plaintiffs' exhibits without objection.
Margolin testified (PX 506, supra, pp. 6-7) that in 1978 he became director of the division that monitored the racial imbalance law and that he also worked on Tirozzi I in addition to his responsibilities for administering the interdistrict cooperative grant program and other voluntary grant programs to racially balance school populations. From the time he assumed the directorship in 1978 and became directly involved in the administration of the racial imbalance law, the department was aware of the racial isolation of the urban school systems (pp. 13-16), and after the regulations were adopted in 1980, enforcement actions were taken against Middletown and Norwalk "and about half a dozen other towns [but we] were frustrated because we knew we couldn't stop the trend that was developing . . . and we [had] no way of controlling that."
Margolin's personal opinion was that the only long term solution to the problem of interdistrict racial imbalance "would be to move to some sort of required/mandatory process" (p. 23), but his view was not shared by the SBE or by the commissioner who believed that the more practical approach would be to pursue voluntary means in the form of "enticements" to school districts. He also stated (p. 32) that he felt that the interdistrict cooperative grant program was not sufficient to address the racial isolation and poverty concentration of the schoolchildren in Hartford, that (p. 42) Tirozzi I went beyond mere statistics and had "very firm recommendations" and that Tirozzi II did not add anything to the earlier report.
He stated further in the course of his deposition (p. 48) that the state's primary responsibility is "to ensure that our kids learn [even in a] negative setting [although] it's not fair to call Hartford a negative setting [because there's] some outstanding education going on there . . ." He also referred (pp. 48-50) to the "Governor's Commission on Quality and Integrated Education" which was appointed in 1990 "to elevate the responsibility out of the state Department of Education [because] it was a multifaceted problem that education in itself could not resolve", but that the commission's report, in his opinion, did not accomplish the goals set for it because although it was a "good effort" it was "all compromise." CT Page 4124
The direct examination concluded with a question put to him as to whether children in Hartford were receiving a minimally adequate education as defined by plaintiffs' counsel (pp. 55-56) as "education that gives a child a chance of leading a successful adult life . . ." His response was (pp. 55-58) that, in general, the majority of them were receiving at least that level of education, even though as a group, the mastery test results showed that many of them were performing below the remedial level, and he also stated that the tests "were never intended to be the sole source to measure student performance."
The Tirozzi deposition, which was taken by the plaintiffs on September 18, 1992, began with counsel's statement (p. 4) that the questions put to him would be based on his expertise and experience during the time that he served as state commissioner of education, and on the "long history you've had in urban education." He stated in response to the first series of questions (pp. 9-10) that students in the Hartford public schools are racially isolated and are likely to become more isolated in the future, and that a total or "holistic" education for both white and minority schoolchildren involves interracial and multiethnic exposure to each other and interaction between them because racial and ethnic isolation has negative effects on both groups.
During his tenure as commissioner from 1983 to 1991, the department and the state board were aware of the harmful effects of racial segregation, and because the filing of annual reports on the racial composition of all school districts was required under the racial imbalance law, he "would have to assume" (pp. 11-12) that the governor as well as anyone else would have been aware of the conditions of racial isolation that existed in the state's largest urban school districts. He also stated that the problems of those districts were compounded by the fact that minorities who live in the inner cities are disproportionately poor and because studies have shown that "the real correlation with academic achievement is socioeconomic class [and that] being poor in and of itself is a significant problem in schools." Id.
In response to the question of what efforts the state CT Page 4125 had made to address the problem of racial segregation in the public schools during his tenure, Tirozzi stated (pp. 14-18) that the most important were the interdistrict cooperative program grants "which was two or three million dollars that was available to allow districts on a voluntary basis to develop a number of plans to move students across district lines [in which we] had more than 100 districts participating in that effort during my last year, developing plans on a cooperative basis." With respect to the financial needs of the cities, he cited the 1986 educational enhancement act which "dramatically raised teachers' salaries" and which permitted the hiring of a substantial number of them, with the great majority going to Hartford, New Haven and Bridgeport, so that class sizes in those cities could be reduced and in order to permit the poorest urban school districts to recruit and retain teachers at salaries that would be at least comparable to, if not higher than, the salary levels in the suburban districts. Id., 15-16.
Tirozzi also referred to the priority school district program (p. 16) which was initially funded at three million dollars "to drive more dollars to cities [and stated that just] about every one of the grants we had was equalized so that more dollars went to the poorer communities; again, the major beneficiaries would have been the cities." He stated later in his testimony (p. 84) that "in our school funding formula, we were the first and may still be the only one that factors in our mastery test scores as one of the proxies for need, and it is driven when students do not meet what we call the remedial standard."
When Tirozzi was questioned about the first recommendation in his initial report, which endorsed the concept of "collective responsibility", he stated (pp. 35-36, 98-99) that it was misunderstood at the time by many people to mean mandatory student assignment which its actually only mandated "corrective action" plans to eliminate racial imbalance with the threat of state intervention only if "the voluntary approach [proved] to be ineffectual." PX 50, p. 11. The recommendation was not implemented at that time because there was no express statutory authority for that kind of interdistrict planning process (pp. 100-04) and the SBE, although it may have agreed with the report in principle, decided that because of CT Page 4126 the strong negative public reaction to the coercive elements of the report, the best thing to do was to encourage discussion, "to let people react [and express] their feelings", and thereafter, Tirozzi personally spent almost a year going around the state and "talking anywhere anyone would listen to me."
Wherever he went across the state he found that "voluntary, cooperative approaches" would generate public support, "but nowhere [did he find] there would be a commitment to mandating that we move in that direction . . ." (p. 125), and after he reported his conclusion to the board that the mandatory aspects ofTirozzi I were "negating the rest of the report", the decision was made to eliminate them from the concept of "collective responsibility" in Tirozzi II. Id. In his opinion (p. 136), the recommendations in the second report had a significant impact due to "the availability of fairly substantial state monies at the time", and the fact that the issues were being discussed by the public and by planning groups, and that although he would "like to see things go faster" (pp. 137-38), progress in dealing with "such a major issue in our society" could be only "incremental" because of what he termed the "political realities" of local control and autonomy, as well as the problems of "[h]ousing, unemployment [and] poverty."
Tirozzi stated on redirect examination (pp. 157-60) that because of the strong negative response to the mandatory aspects of Tirozzi I, and what he believed to be the very positive reaction to Tirozzi II based on the fact that so many districts across the state expressed their interest in the voluntary planning process, his opinion had changed, and he felt that voluntary approaches could bring about a meaningful level of integration and that "even the General Assembly could accept" legislative proposals along those lines. He suggested two areas in which such legislation could have a "dramatic impact", first, by changing the school funding formula to encourage the movement of children across town lines, and, second, by adjusting the state's proportional share of school construction costs so as to reward districts that build schools closer to their borders.
He was also asked earlier in his direct examination CT Page 4127 (pp. 92-93) to explain the way he would structure an integration plan and what elements would have to be included in order to minimize the level of "white flight", and stated that he "would do everything in [his] power to develop voluntary measures" because "local communities [are not] going to do it . . . of their own volition", and that he would use the "carrot" approach to provide enough financial incentives and resources to make it "extremely attractive" for people to participate, as well as "sticks", by way of disincentives, to make it less desirable not to do so, because "[i]t's incredible what the power of money can do . . ." He also stated that in the first report (PX 50, p. 12), as part of the suggested implementation of the collective responsibility concept, five groupings of suburban school districts contiguous and adjacent to New Haven (Figure 3), New London (Figure 4), Bridgeport (Figure 5), Hartford and Bloomfield (Figure 6), and Waterbury (Figure 7) were proposed, based in part on the distances involved, because (pp. 93-94) "[t]he farther the parents feel their children are . . ." from their residential communities, the less likely it is that a regional plan will succeed.
Tirozzi stated (p. 95) that his opinion about white flight was based on his experience in the 1960's as a teacher in the New Haven school system when that city "started its own forced busing" before the racial imbalance law was passed in 1969. In his opinion, "the fact that New Haven aggressively pushed the issue and actually forced, had forced busing, it was non-negotiable, I think drove a significant number of whites from the city." Id.
It can reasonably be assumed from this particular portion of his testimony and the fact that his resume states (PX 478, p. 2) that he was a teacher at the Sheridan Middle School from 1962 to 1965 and its principal from 1968 to 1969, that Tirozzi was referring to the plan adopted by the New Haven board of education on July 7, 1964 which was upheld by the trial court in a decision filed on July 8, 1965 and reported in Guida v. Board of Education,26 Conn. Sup. 121 (1965). The plan, entitled `Proposals for promoting equality of educational opportunity and dealing with problems of racial imbalance', called for the pairing of Sheridan Junior High School, which served a predominantly white area and another junior high school which was a CT Page 4128 predominantly minority school, into one attendance zone and also provided "that all seventh grade pupils in the entire zone attend one school and all eighth grade pupils in the area attend the other [thereby requiring the] bussing [sic] of some pupils . . . and as a result the racial imbalance in the area was equated to a certain extent." Id., 122.
The court held in the Guida case that the plan did not violate General Statutes § 10-15[3] (now codified as § 10-15c) because "it [excluded] no one from any school and [had] no tendency to foster or produce racial segregation. . . ." Id., 123. It also held that the plan's adoption and implementation were within "the extensive powers enjoyed by boards of education [and that there was] no constitutional prohibition on the board against taking into account . . . the factor of racial imbalance." Id., 123-24.
He also testified (pp. 53-54) that it was his belief that the enhancement of city schools would have to be an essential part of any integration plan, and that the state had already taken some "very positive steps", particularly with respect to teachers' salaries following the enactment of the educational enhancement act, so that the highest salaries in the state were being paid to teachers in the larger urban districts. He pointed out, however, that providing support services such as teacher aides, school psychologists and social workers "of high quality and sufficient number" was a particularly acute problem in the cities because of the disproportionately large number of children with special educational needs, but on the other hand, "some of the best special education classes in the state" can be found in urban districts such as Hartford. Id., 54-55.
Tirozzi was then asked a series of questions (pp. 63-69) based on the research findings of a number of the plaintiffs' expert witnesses in the fields of education and sociology who later testified at the trial, including Jomills Braddock of the University of Miami, Robert Crain of Columbia University, Mary Kennedy of Michigan State University, William Trent of the University of Illinois and Charles Willie and Gary Orfield of Harvard University. His answer to each question was that he was aware of the particular research and agreed with its conclusions that 1) school segregation tends to perpetuate segregation in CT Page 4129 adult life, 2) a consideration of the benefits of integration should include its effects on long term education and career outcomes as well as academic achievement, 3) academic performance of white students is not detrimentally affected by integration, 4) academic achievement is improved when integration begins in the early grades, 5) white and black students from integrated schools are more likely to have close friends of the other race, 6) integrated elementary school and high school experiences are associated with integrated college experiences, 7) students from integrated schools are more likely to work in an integrated environment and in integrated neighborhoods as adults, and 8) achievement scores of all students decline as the proportion of poor children increases and the poverty concentration of a school is in itself a cause of lowered achievement.
Tirozzi also stated (pp. 81-82) that one important standard that he would use in determining whether a group of students was receiving a minimally adequate education would be the Connecticut mastery testing program, which "clearly represents what we believe all students should know [when they reach] the fourth, sixth and eighth grade in critical subject areas like reading, mathematics, language arts and writing." He also referred to "Connecticut's Common Core of Learning" (PX 45a), a policy statement issued by the SBE in January, 1987, as representing what the state expects its high school graduates to know, but stated that it was a "series of expectations" rather than a "formal assessment" of what that knowledge should be.[4]
In response to the question (pp. 83-84) of how he would use the mastery test results to determine whether a minimally adequate education was being provided, and the question (p. 84), "[i]s the remedial standard [prescribed by the testing program] the standard below which you would define a student as not receiving a minimally adequate education?", he replied that the purposes of the tests were to inform districts so that they could improve their programs, correct deficiencies, and plan for the future, as well as to provide the basis for the disbursement of funds to the districts that were not performing at or above the remedial standard. His answer to the second question (pp. 84-86) concerning the use of the remedial standard as a measure of the quality of the education being provided by a CT Page 4130 particular district was that the remedial standard was a "second standard" that had to be created "for the purpose of the grant" to determine which school systems required additional funding in order to improve the achievement of the students with the "greatest need", and a district that had a "high percentage who met the standard . . . would mean [that it was] doing well, and a low percentage would mean [it was] not doing well. . . ."
Tirozzi also stated (pp. 88-89) that he could not define the term "equal educational opportunity" in the legal sense, but that as an educator, and based only on the Connecticut mastery test results, he would conclude that children in the cities and the poorer communities throughout the state including Hartford, were not "receiving the same level of education as some of the other communities." He also expressed his opinion (p. 90) as an educator, and again using only the test results as the standard, that the children in Hartford who fell below the remedial standard were not receiving "a minimally acceptable education."
Ferrandino's testimony (PX 493) covered the period from his appointment as education commissioner in June, 1992 to October 1, 1992 and October 6, 1992, the dates on which his deposition was taken, and the personal opinions that he expressed about the issues in this case were generally consistent with those that had been offered by Tirozzi in his deposition, including whether he agreed with some of the factual claims and conclusions asserted in the plaintiffs' complaint that had not been expressly admitted or denied by the defendants in their answer. He testified (pp. 23-25) that as a part of his reorganization of the DOE after he had assumed the commissionership, he had established an office of urban and priority school districts in order to concentrate the resources of the department on the problems of the cities, and more specifically, to improve the achievement of the students in the three largest urban districts because (p. 25) "I don't think the results that we have attained in working with the cities have been the kind of results that we would like to see [and that student] achievement was really the bottom line for us", and that their budgetary options and legislative agenda "needed to be focused on how that activity would enhance student achievement." CT Page 4131
It was his opinion (pp. 86-87) that a mandated regional plan would not resolve the problems of racial and economic isolation and would be very likely to generate a negative reaction because of the "strong history in this state of local control of education [and the] very strong attachment to the local school system" and based also on his own personal experience as a principal of a regional high school and later, as superintendent of a regional school district [Ferrandino resume, PX 499), that the limited regionalization that occurred in the 1950's was accomplished only because of the financial and economic incentives that it offered to the smaller communities in the state. In response to a later question (p. 117) asking his opinion as to which would be "the more reasonable and better approach to achieve the goals of integration . . .", he stated that the more voluntary the process, the greater the chance for its success because it would be the result of the cooperative efforts of all the interested parties and the governmental entities involved in the process.
Ferrandino was asked at a later point in his deposition (pp. 131-39) to give his personal opinion as to whether he agreed with certain paragraphs of the complaint which had been denied, at least in part, by the state in its answer, and said that he agreed that the Hartford schools contain a "far greater proportion of students at all levels, from backgrounds that put them `at risk' of lower educational achievement [and that the] cumulative responsibility for educating this high proportion of at-risk students places [those schools] at a severe educational disadvantage in comparison with the suburban schools." Complaint, paragraph 35. He stated that he also agreed that "[a]ll children, including those deemed at risk of lower educational achievement, have the capacity to learn if given a suitable education [but] because the Hartford public schools have an extraordinary proportion of at-risk students among their student populations, they operate at a severe educational disadvantage in addressing the educational needs of all students — not only those who are at risk, but those who are not [and that the] sheer proportion of at-risk students imposes enormous educational burdens on the individual students, teachers, classrooms, and on the schools within the [city] of Hartford." Id., paragraph 36.
In response to the question of whether he agreed that CT Page 4132 "[t]hese burdens have deprived both the at-risk children and all other Hartford schoolchildren of their right to an equal educational opportunity . . ." as alleged in the last sentence of paragraph 36, he stated (p. 133) that his personal definition of that term, as an educator, was that "an equal educational opportunity is one whereby the students in Hartford are provided with the level of resources, the level of competence in terms of instruction, an ongoing systematic program that is similar to that of other communities in the state." His answer to the question was (pp. 132-33) that he believed that "the program, the curriculum that is being offered in Hartford does provide [under his definition] an equal educational opportunity to that of other students in other school systems around the state."
He also explained (pp. 146-48) that, for the purpose of analyzing the mastery test results, all the districts in the state were classified by "educational reference group" based on the size of the community and its student population as well as the various needs of their students, and that Hartford, Bridgeport and New Haven constituted one of the groups even though Hartford's performance was lower than the other two. He stated that the testing program was not designed to be used comparatively but was intended to provide information about individual students and programs for the local school district. Id.
Mannix, who had been a member of the SBE for nine and one-half years at the time he gave his deposition (PX 495), was questioned about the mastery tests and testified (p. 17) that the present testing system was better than the previous one because it was created by Connecticut teachers based on this state's own educational goals, and he felt that it was the "consensus on the board that it's a valuable tool in judging the outputs of the school systems." He also stated (pp. 12-18) that "schooling", whether or not it takes place in an integrated setting, was only one component of a quality education, and that whether or not such an education was acquired by a particular student depended to a great extent on the physical, social and economic environment in which the child lived as well as whether the family unit of which the child was a part was a positive influence in terms of educational performance and achievement. CT Page 4133
After he had stated (p. 30) that he supported the plaintiffs' position in this case, and was asked what he thought should be done to address the problems which gave rise to this action, he said (pp. 22-24) that integration in the fullest sense could be achieved only by building affordable housing in the suburbs in order "to break up the ghettos in the cities . . .", and by making urban schools more attractive in order to "bring back the white population . . . into the cities. . . ." On the other hand (p. 26), he was not inclined to change town boundaries unless "it became absolutely necessary under some conditions I can't envision at this point . . .", and also stated (pp. 20-21) that he was opposed to busing to achieve integration, even though as a town selectman in Wilton he was in favor of busing children from Bridgeport as part of a Project Concern program in 1966 or 1967 and he felt that the program "helped those children who came into Wilton . . ."[5]
The first witness called by the plaintiffs was David Carter, president of Eastern Connecticut State University and former co-chairman of the governor's commission on quality and integrated education, and the commission's report (PX 73) entitled "Crossing the Bridge to Equality and Excellence: A Vision of Quality and Integrated Education for Connecticut" was introduced in evidence as a plaintiffs' exhibit. The transmittal letter to Governor O'Neill dated December 31, 1990 states that the report was "the culmination of 17 months of research, consultation and discussions with state and national education experts, Connecticut's citizens, students, teachers, administrators, public officials and state agency personnel."
Although the report was unanimously adopted, the letter refers to a difference of opinion between those members who favored mandatory approaches to achieving quality integrated education and those who felt that mandates were beyond the governor's charge to the commission or that such approaches were ineffective, and asks the incumbent governor and Governor-elect Weicker "to recognize that strong arguments supporting both options have been advanced by Commission members and Connecticut citizens at public hearing held across the state." It also states that "[w]e now realize that no set of educational strategies can fully address the myriad social issues that produce inequality and undermine education . . .", that "[s]ubstance abuse, hunger, parental CT Page 4134 neglect, crowded and substandard housing and inadequate employment opportunities disproportionately attack minority children in our state and divert them from educational opportunity . . .", and that "[u]nless other elements of society and other institutions actively share with education the responsibility for addressing and remedying these condition, not even the best of strategic education plans can succeed."
The introduction to the commission's report stated that "Connecticut has long acknowledged an affirmative responsibility to desegregate its public schools and to guarantee educational equality for all students", and then gave examples of "[t]he state's history of affirmative achievement" beginning in 1966 with Project Concern which was "designed to promote voluntary desegregation" of urban schools and was "one of this country's first voluntary interdistrict transfer programs", followed by the racial imbalance law in 1969, the inclusion in the state school aid formula of the number of children from low-income families in 1979, and thereafter in 1989, factoring into the formula the number of students who score below the remedial standard in order to address "the needs of urban school districts", state funding for magnet schools to improve "the overall quality of education while reducing racial isolation",Tirozzi I in 1988 and Tirozzi II in 1989, and since 1988, the "competitive interdistrict cooperative grant program on educational programs that provide opportunities for integration . . ." The report also includes "An Open Letter to the People of the State of Connecticut" by Governor O'Neill in which he stated that "[m]any of our students are isolated in schools that are either largely middle class and white or largely poor and non-white . . .", that much could be learned from the experience of other states in seeking to achieve the "twin goals of quality and integration [but at] the same time Connecticut's answers will be particular to Connecticut, reflecting our special circumstances, history and heritage."
Carter acknowledged that the governor's charge to the commission was "indeed to examine voluntary and or cooperative measures or approaches" (Carter, 1/37-38)[6] and that there was no discussion about mandatory measures until "the last two [or] three meetings, where it became very clear that there were some who felt that voluntary was not CT Page 4135 enough [and] as a result of coming to grips with the totality of the problem, started to believe that something needed to be done and something needed to be done urgently." Id. He also stated that "there's still a question mark on the legislative will", and referred to an article that he wrote about Brown v. Board of Education, 349 U.S. 294 (1955) (Brown II), in which he used the term "dynamic gradualism" in the same sense as "all deliberate speed" was used inBrown II to mean that "there was a great deal of motion but very little movement . . ." Id., 55-56.
The rather imprecise phrase, "all deliberate speed", which Carter equated with "dynamic gradualism", was articulated by the Supreme Court in Brown II as the remedial standard for the desegregation of school districts based on the holding of Brown I that "[s]eparate educational facilities are inherently unequal", Id., 495, but after ten years it was found to be unworkable because of "the open and violent resistance which Brown was encountering in the South." L. Tribe, American Constitutional Law, § 16-18, p. 1489 (2d Ed. 1988). In Griffin v. County School Board,377 U.S. 218 (1964), which reached the Supreme Court after the Virginia General Assembly repealed the state's compulsory attendance laws and made school attendance a matter of local option, the Court stated "that the issues here imperatively call for decision now [because the] case has been delayed since 1951 by resistance at the state and county level, by legislation, and by lawsuits [and that there] has been entirely too much deliberation and not enough speed in enforcing the constitutional rights which we held [in Brown I] had been denied Prince Edward County Negro children." Id., 229.
The same theme sounded by Carter of "too much deliberation and not enough speed" on the part of the state in dealing with the growing and festering problems of the Hartford school district were echoed by William Gordon, an expert on school desegregation planning, in the course of his testimony on rebuttal (34/87-88), when he stated that "[w]e used to take `deliberate speed' and use it this way: we would say that the school systems want to be very deliberate and the plaintiffs want some speed, and neither one has occurred, really." His answer was given in response to a question which referred to the statement, `[s]low and steady wins the race', made by Christine Rossell, one of two CT Page 4136 desegregation planners called by the defendants, who favored an incremental approach to desegregation remedies. Id., 87.
In the course of his examination by the court after his rebuttal testimony, Gordon also stated that "Connecticut's efforts have not risen to the level of action" (id., 84) and made reference to the opinions he had stated in his direct examination that Connecticut "has been a leader [only] in studying [this problem] exhaustively" (13/5), and that it had not taken any "`significant steps' toward solving the problem of racial isolation". Id. He also stated that based on his experience with eighty desegregation plans since 1967 he had never encountered "a metropolitan desegregation plan that was put into place without a Court order." (12/119.)
Gordon also stated (12/157-59) that he had prepared a diagram (PX 488) in the form of a time line showing the continued increase in the minority population from 1963, when the number of minority students in Hartford was only forty-three percent of the total enrolment, on which he had entered and identified some of the various reports and documents alleged in the pleadings as well as those that had been introduced in evidence by the plaintiffs and marked PX 1 through 89. He also testified (13/83-85) that in his opinion the desegregation planning process mandated by the federal courts after a finding of de jure segregation could be successfully pursued in the Hartford region even though there were additional complicating factors because of the substantial Hispanic population and the special language programs that would therefore be required, and because the planners would also have to deal with the problems of poverty in addition to those of race and ethnicity.
In the course of his cross-examination he stated (13/89-90) that although he had no legal expertise in this area, many of the cases he had worked on such as those in Kansas City, Missouri; Dayton and Cleveland, Ohio; and Benton Harbor, Michigan, were cases of de facto segregation, which he defined as segregation "that has occurred because of the activity of government officials operating outside of a legal parameter that makes them segregate youngsters, they do it by their actions in using their authority as state officials." He also stated (13/159-60) that in almost all of his cases the school districts were counties rather than CT Page 4137 municipalities, although he recalled that one of his cases in Pennsylvania, which he thought began in 1980 and was still going on,[7] involved five separate municipal school systems.
In the course of his cross-examination as a rebuttal witness Gordon stated (34/74) that he "never questioned the commitment of this state to desegregation; it's a question of what they've done." He also stated (34/86) that Connecticut's long term study of the problem "borders more on purposeful discrimination" than merely a matter of its having ignored the problem.
Gordon stated (13/72-74) that in his opinion,Tirozzi II "retreats completely from Tirozzi I [and] goes purely to voluntary strategies [although it] does propose interdistrict cooperation grants for planning and implementation and curriculum innovation." It was his opinion that because the report apparently abandoned the "strong role that the state would take in it", that it had thereby abandoned the concept of "collective responsibility", and was therefore not "a meaningful or effective set of recommendations" to address the problems of racial isolation.
He also referred in his testimony to the resolution creating the governor's commission on quality and integrated education after this action had been filed, and the fact that the governor's charge precluded the commission from recommending any kind of "mandatory planning processes." Id., 74-77. He described the report, however, as being "important" because its findings were similar to those in the Harvard report (PX 1), but also stated that it entailed a high level of funding because "if you have no stick the only thing you can do is put out a bigger carrot, and that's pretty much what it does."
It was also his opinion that the report's recommendations would not be sufficient to address the problem of racial isolation in the Hartford schools, because although "[t]hey would go towards it they certainly wouldn't do it." Id., 77. He agreed that the proposals contained in the report for such things as "school grants, pre-school programs [and] technology links [were] all things that are good to have in schools, but they really don't address CT Page 4138 desegregation." Id.
Gordon was also asked (13/82) to state his "reaction . . . as an expert in educational equity and desegregation planning" to the "State of the State Message for Connecticut" that had been delivered by incoming Governor Lowell P. Weicker, Jr. on January 6, 1993, the eleventh day of the trial, and the day before Gordon began his testimony. After the text of the speech had been admitted as a full exhibit (PX 90), Gordon stated that it acknowledged "the harms of segregation [and] the state's responsibility. . . ." Id., 83.
The Governor began his address by stating that despite such positive aspects of the state's educational system as the highest teacher salaries and the best teacher to pupil ratio in the nation, and the fact that it was one of the "top five" states in per pupil spending, "there are two Connecticut when it comes to the education of our children, Connecticut separated by racial and economic divisions. There is a Connecticut of promise, as seen in its suburbs, and a Connecticut of despair as seen it its poverty-stricken cities." (PX 90, 4-5.) After citing the statistical data showing the concentration of poverty in the state's largest cities, the Governor went on to state that "[t]he racial and economic isolation in Connecticut's school system is indisputable [and that whether] this segregation came about through the chance of historical boundaries or economic forces beyond the control of the state or whether it came about through private decisions or in spite of the best educational efforts of the state, what matters is that it is here and must be dealt with." Id., 7.
He then proceeded to outline legislative proposals for six educational regions, the development by each region of a five year plan proposed by local and regional representative groups to reduce racial isolation, and "to provide all students with a quality, integrated learning experience", and emphasized the fact that "[l]ocal decisions and local involvement will guide the process." Id., 9-11. In response to the court's question later in his testimony, Gordon stated that "the governor [has] certainly identified the problem very clearly" and that it would put him in a "difficult position" if he were to have to give his opinion as to whether the solution the Governor had proposed should CT Page 4139 be implemented (13/166).
David Armor, of the Institute for Public Policy at George Mason University, a sociologist, testified as an expert witness for the state on the correlation between race, poverty and academic achievement. He stated (32/98) that it was his opinion that it is the socioeconomic status of school children that influences academic performance and that explains the reduction "almost by half [of the] achievement gap between black and white student nationally" between 1970 and 1990, that "[v]irtually none of the gain can be attributed to school desegregation", and that he disagreed (32/19) with the contrary opinion expressed by the plaintiffs' witness, Gary Orfield, professor of education and social policy at Harvard University, that "it makes no sense to separate race and poverty" even if it were analytically possible to do so.
In the course of his testimony Armor stated the conclusions that he had reached as the result of a study that he had made of the disparities in the test scores between Hartford and the suburban towns in order to determine "the role of racial segregation in causing those differences" (32/17) insofar as it related to the plaintiffs' claims that they were being deprived of an equal educational opportunity. The conclusions that he reached as a result of his analysis were (32/94-95) that racial composition did not have any statistically significant effect on achievement scores and that the differences in educational outcomes could be explained by the "extremely different" levels of the socioeconomic status of the children in the respective school systems and that his findings were consistent with similar studies conducted by other researchers.
Christine Rossell, a professor of political science at Boston University, an expert witness called by the state, testified (26B/31-34) that it was her opinion based on the research she has done using a data base of six hundred school districts throughout the country and her experience in designing desegregation plans, that mandatory student reassignment plans to achieve racial balance, whether intradistrict or interdistrict, are ineffective methods of achieving integration, whether they are mandated by racial imbalance laws or by Court order. Under her analysis, one CT Page 4140 of the principal problems with using racial balance as the measure of integration is that it fails to take into account the decrease in white enrolment that her studies have shown takes place both before and after a plan is put into effect. Id. 34.
The divergent and apparently irreconcilable opinions of the expert witnesses whose testimony has just been summarized, it should be noted, relate only to remedy, and very much like the controversy between the parties which is the subject matter of this action, they do not reflect any serious disagreement between them as to the goals which they seek to achieve, but differ only as to the most effective means of working towards those goals. For example, the "carrot and stick" approach now advocated by Rossell, as she stated in her testimony, has changed and developed over the years based on her experience in desegregation planning[8] on the national level in much the same way that Tirozzi's views changed in the course of his tenure as education commissioner on the state level as he explained in the course of his deposition testimony.
At this point, the court's review of the salient evidence having been completed, it should be noted that although the plaintiffs' argument has been that this case, at least in terms of the legal issues that it raises, is virtually a perfect analog of Horton I, it differs in one significant respect in terms of the nature of the target against which the constitutional challenge is directed. Reference will be made as well to the legislature's response to Governor Weicker's proposals which the plaintiffs' claim is similar, both qualitatively and quantitatively, to its response to the trial court's judgement in favor of the plaintiffs in Horton, and the reasons that prompted the court's reconsideration of the question of justiciability.
Judge Rubinow's decision at the trial court level inHorton I, supra, 31 Conn. Sup. 377, was that "the system of financing public schools in this state" was unconstitutional. Id., 378. That "system" was consistently referred to by the court throughout the opinion as one that was based on numerous "duty-delegating statutes", "statutory programs", a "method of raising funds [that is] the result of legislation", a "statutory system", and the declaratory judgment itself that was rendered in the case was expressly CT Page 4141 stated to be "that General Statutes §§ 10-240 and 10-241" were unconstitutional. Id., 382, 385, 391.
The Supreme Court, in its opinion in Horton I, stated that "the present system of financing public education in Connecticut [is] principally embodied in §§ 10-240 and10-241 of the General Statutes", and that the state distributes funds "pursuant to legislation providing for a flat grant. . . ." Horton I, supra, 172 Conn. 621. The court also affirmed the trial court's post-judgment supplemental finding that the legislative response to its decision in increasing the flat grant by the use of lottery proceeds was `miniscule and not significant', and therefore that it had failed to remedy the constitutional violation that had previously been found to exist. Id., 636-38.
The claims made by the plaintiffs in this case are distinguishable from those in Horton I in that they are not challenging the constitutionality of any particular statute or legislative classification but rather what they describe as a "present condition of racial segregation" that exists in the Hartford area schools (Record Item #159, pp. 5-6). Nevertheless, the response that was fashioned by the General Assembly to the issues that have been raised by this case as a result of the initiatives proposed by the Governor at the opening of the legislative session will be briefly reviewed.
On June 28, 1993, which was also the date on which the defendants' post-trial brief was filed, Public Act No. 93-263, (now codified as General Statutes §§ 10-264a to 10-264b) entitled "An Act Improving Educational Quality and Diversity" was signed by the Governor. It provided a timetable beginning on January 15, 1994 for the convening of local and regional "forums" for the purpose of developing regional "education and community improvement plans" which were to be voted on by each of eleven regions in the state. Under what has now been codified as § 10-264a(3), an "Education and Community Improvement Plan" is defined as follows:
 (3) `Education and community improvement plan' or `plan' means (A) a voluntary cooperative interdistrict or regional plan to (i) improve the quality of school performance and student outcomes through initiatives which may include, but are not CT Page 4142 limited to, magnet schools and programs, interdistrict schools and programs, regional vocational-technical schools, regional vocational-agricultural programs, interdistrict student attendance including school choice, charter schools, early childhood education and parent education, summer school, extra-curricular activities, student community service, paired schools, teacher and administrator exchange and interactive telecommunications; (ii) reduce barriers to opportunity including, but not limited to, poverty, unemployment and the lack of housing and transportation; (iii) enhance student diversity and awareness of diversity or (iv) address the programmatic needs of limited English proficient students with quality limited English proficient and bilingual programs or (B) a voluntary local plan for purposes of section 10-264f. (C) Each such plan shall provide equal opportunity for all students, including such additional services as may be necessary to ensure meaningful participation in a program. (D) Notwithstanding any provision of the general statutes to the contrary, the commissioner of education may grant waivers of specific state statutory or regulatory mandates upon application of one or more local or regional boards of education, provided (i) requests for such waivers care included in a plan and (ii) such waivers are consistent with the educational interests of the state.
On December 16, 1993, the date originally scheduled for final arguments in the case, the court itself raised the issue of justiciability by reason of the enactment of the statute, and thereafter, briefs were filed on the jurisdictional issue by the parties, and a group of law professors also filed a brief as amici curiae in support of the plaintiffs' position. The court subsequently ruled that it would be in the interest of judicial economy to decide the question of justiciability in the context of all the evidence in the case and in accordance with the dissenting opinion in Pellegrino v. O'Neill, supra, 193 Conn. 693.
The issue of justiciability was revisited by the court CT Page 4143 because of its concern about the last three considerations stated in Baker v. Carr, 369 U.S. 186, 217 (1962), namely, "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." That concern, however, has been resolved by the court in favor of justiciability because those considerations "reflect a `prudential' view" and the facts and circumstances of this case justify that conclusion. Fonfarav. Reapportionment Commission, 222 Conn. 166, 185 (1992).
The court's ruling is also based on the fact that some of the issues raised in this case are similar to those in school finance cases where justiciability is almost invariably found. McDaniel v. Thomas, 285 S.E.2d 156, 157
(Ga. 1981). Although there are other issues and the remedy sought by the plaintiffs go far beyond those ordinarily present in those cases, they involve, at least in part, the allocation of resources to meet the "constitutional imperative" of educating children. Board of Education,Levittown Union Free School District, Nassau County v.Nyquist, 443 N.Y.S.2d 843, 854 (App.Div. 1981).
For the foregoing reasons as well as for those stated as the basis for the court's prior rulings which are incorporated herein by reference, the court finds that the controversy between the parties is justiciable.
The court directed counsel for the plaintiffs to amend the complaint to allege the passage of Public Act 263 and to articulate the effect, if any, that the legislation might have on their claims of law. The plaintiffs then filed a request to amend by adding proposed paragraphs 66a and 66b, and after the state's objection to the request was overruled the state filed its amended answer.
Paragraph 66a of the revised complaint dated November 23, 1994, which was denied by the defendants, states that in January of 1993, "in response to this lawsuit, defendant Governor Lowell Weicker, in his annual state of the state address, called on the legislature to address `[t]he racial and economic isolation in CT Page 4144 Connecticut's school system,' and the related educational inequities in Connecticut's schools." Paragraph 66b, which is admitted by the defendants only insofar as it alleges the passage of the public act, states that "[a]s in the past, the legislature failed to act effectively in response to the Governor's call for school desegregation initiatives [and instead], a voluntary desegregation planning bill was passed, P.A. 93-263, which contains no racial or poverty concentration goals, no guaranteed funding, no provisions for educational enhancements for city schools, and no mandates for local compliance."
In the introduction to their reply brief dated August 16, 1993, the plaintiffs refer to the "commonality" of the interests of the parties in this case, particularly as reflected in the deposition testimony of Tirozzi, Ferrandino, Margolin and Mannix, as well as in Governor Weicker's message to the legislature. They go on to state that the first of the major legal issues that must be addressed by the court is, as they put it, "the nature of a state action requirement."
The issue of whether state action exists under the facts and circumstance of this case was first raised by the defendants in their motion to strike, and was denied at that time as being premature, and was again raised by the defendants in their motion for summary judgment on the ground that state action of some kind must be found to exist before the constitutional issues raised by the plaintiffs in the complaint may be considered, and again denied by this court because, "the question of whether or not the state's action rises to the level of a constitutional violation goes to the merits of the present case . . ." Sheff, supra, 42 Conn. Sup. 176.
Professor Lawrence Tribe, in his treatise, AmericanConstitutional Law, states in his introduction to chapter 18 entitled "The Problem of State Action", that:
 [n]early all of the Constitution's self-executing, and therefore judicially enforceable, guarantees of individual rights shield individuals only from government action. Accordingly, when litigants claim the protection of such guarantees, courts must first determine whether it is indeed government action — state or federal — that the CT Page 4145 litigants are challenging.
Tribe, supra, American Constitutional Law, p. 1688 (2d Ed. 1988).
Therefore, the issue of whether state action exists under the facts and circumstances of this case must now be addressed in the light of all the relevant evidence that has been offered on that question in the course of the trial.
Christopher Collier, a professor of history at the University of Connecticut and the officially designated state historian for Connecticut, was called as a witness by the plaintiffs and testified (16/53) that education in Connecticut "has always been under the full control of the colony or the state government." He also stated that in his opinion the "public policy [of the state and colony] from the inception of our system [has been that it is] essential for our form of government that all students receive an equal educational opportunity." Id., 54.
He also traced the history of race relations in this case and stated that "it's no coincidence that the first civil rights commission in the United States was established in Connecticut in 1942 [because it was] clearly the result of the disparities that were then very apparent" with respect to employment and housing. Id., 45-46. In this connection, an exhibit offered into evidence which was issued in 1961 by the Connecticut commission on civil rights (PX 502, p. 2) offers the following account of civil rights legislation after 1942:
 Connecticut's record of activities designed to give Negroes equality with whites spans more than a century. Prior to the Civil War, the abolitionist movement had many supporters in Connecticut. Soon after the Civil War, the state legislature desegregated all public schools. The state constitution was amended in 1876 to eliminate the requirement that voters be white. In 1905 the first public accommodations law declared illegal racial discrimination in hotels, restaurants, transportation facilities, and places of amusement. In 1936, discrimination in employment in the state service was outlawed. In 1943 the state Inter-racial Commission was CT Page 4146 created, and the Governor was authorized to appoint ten Commissioners with powers to investigate employment opportunities, violations of civil liberties, and related matters. In 1947, a Fair Employment Practices Act empowered the Inter-racial Commission to proceed against employers, employment agencies, or unions who engaged in discriminatory practices based on race, religion, or national origin. Discrimination in public housing projects was declared illegal in 1949. In 1951 the legislature changed the name of the agency to the Commission on Civil Rights, to make clear that the Commission was not concerned exclusively with discrimination based on race or color. In 1953 the Public Accommodations Act was extended to cover all establishments offering goods or services to the public. And again the legislature, in 1959, extended the Public Accommodations Act into the area of private housing prohibiting discrimination in the sale or rental of a housing accommodation which was one of five or more contiguous units under the control of one owner or agent. In 1961 the legislature extended the coverage to three or more units.
 The cumulative record of Connecticut civil rights legislation in the area of race relations probably represents a maximum of progress toward equal opportunity between whites and Negroes achieved by any of the Northern states. The issues of school desegregation and voting rights, which are paramount in the struggle for Negro rights in the deep South today, were resolved in Connecticut within a decade after the close of the Civil War.
Collier also stated that with respect to education, "[b]lacks were always permitted to go to the district schools [and he had] not found any case, except one ephemeral one, in which blacks were not permitted to go [to] the district schools." He also noted that for all practical purposes de jure segregation in the schools has never existed except that the City of Hartford "had this black school, Pearl Street School, and they passed an ordinance requiring black kids to go to the black school [and CT Page 4147 thereafter the] General Assembly met within weeks" and repealed the ordinance, "so there's only been de jure segregation in Connecticut for a matter of weeks, and that only in one place." Id., 48.
The "ephemeral" episode of de jure segregation is described in greater detail in a law review article, which states that:
De Jure Segregation In Hartford
 In 1868, the General Assembly passed a one sentence amendment to the Education Law which provided for open enrollment without regard to race or color. The history of that amendment (which is still on the books as part section 10-15
of the Connecticut General Statutes) goes back at least to 1830. In that year the General Assembly passed a Special Act which brought the doctrine of "separate but equal" to the Hartford school system:
 RESOLVED BY THIS ASSEMBLY, that the first school society in the town of Hartford, be, and they are hereby empowered to cause a school to be kept within said society, exclusively for colored children. . . .
 By 1868, the paternalistic tenor of the 1830 law had deteriorated. In the spring of 1868, a town meeting was held at Hartford to discuss the question as to
 whether white children shall be forced to mix and miscegenate with negroes in the schools.
 The Hartford Courant of the day reported the text of the ordinance passed by that town meeting:
 [It should not be lawful for any of the colored children residing therein (in five of the town's attendance districts) to attend upon or be educated in any of CT Page 4148 the schools of said districts, but it shall be the duty of said children to attend said Pearl Street colored School.
 To their credit the members of the General Assembly responded to the ordinance adopted at that Hartford town meeting by quickly passing Connecticut's open enrollment law.
R. Marcin, Nineteenth Century De Jure Segregation inConnecticut, 43 Conn. B.J. 394 (1971).
In the course of Collier's cross-examination, counsel for the state (16/69) asked him whether "the kind of de jure segregation that was under review in (Brown I) existed in the state of Connecticut [only] in Hartford, for a matter of weeks, if at all." His answer was that de jure segregation of blacks "was never a state policy in Connecticut." Id.
Collier also stated that "the maintenance of the town district system" was the most important factor that contributed to the "present segregated conditions" in the urban schools. Id., 53. During his cross-examination he stated that the law enacted in 1909 that consolidated most of the school districts in the state based on town boundaries "was a positive thing for the quality of education in Connecticut", that the legislation "had nothing to do with race whatsoever" and that it was "not a product of any discriminatory motive on the part of the General Assembly or the people of Connecticut . . ." Id., 66, 68.
Justice William O. Douglas was the principal and most consistent proponent of the view that strict constitutional liability, that is, liability without fault, should be imposed on local and state governments for conditions of segregation that arose from demographic, social and economic forces that were not within their direct control because "there is no constitutional difference between de jure and de facto segregation, for each is the product of state actions or policies." Keyes v. School District No. 1,413 U.S. 189, 216 (1972) (Douglas, J., concurring). His concurring opinion in Keyes adopts the language of Judge Wisdom in United States v. Texas Education Agency, 467 F.2d 848,863-64 (5th Cir. 1972), that "[w]hen school authorities, by their actions, contribute to segregation in CT Page 4149 education, whether by causing additional segregation or maintaining existing segregation, they deny to the students equal protection of the laws."
Justice Douglas also quoted with approval Judge Wisdom's further statement in the Texas Education Agency
case that "[w]e need not define the quantity of state participation which is a prerequisite to a finding of constitutional violation [because] the necessary degree of state involvement is incapable of precise definition and must be defined on a case-by-case basis." Id. Douglas also stated in the Keyes concurrence that any attempt to differentiate between de facto and de jure segregation would be an exercise in futility because the manifestations of state participation that are often described as "de facto" are "only more subtle types of state action that create or maintain a wholly or partially segregated school system." Id.
Douglas repeated his views on de facto segregation in his dissenting opinion in Milliken v. Bradley, 418 U.S. 717,761 (1974) when he stated that "there is so far as the school cases go no constitutional difference between de facto and de jure segregation [and that each] school board performs state action [in the constitutional sense] when it draws the lines that confine it to a given area, when it builds schools at particular sites or when it allocates students." He also noted, however, that "[i]t is conceivable that ghettos develop on their own without any hint of state action [but] since Michigan by one device or another over the years created black school districts and white school districts, the task of equity is to provide a unitary system for the affected area where, as here, the State washes its hands of its own creations." Id., 762.
It should also be noted that prior to Keyes, Justice Douglas, acting as Circuit Justice, denied a preliminary injunction against the modification of a racial imbalance plan for a California high school district, and acknowledged that "the precise contours of de jure segregation" had not yet been drawn by the Supreme Court. Gomperts v. Chase,404 U.S. 1237, 1238 (1971). He stated that unlike other California counties where dual systems had been maintained for many years, "[s]o far as I can tell, a different history has prevailed in San Mateo County, or at least it is not CT Page 4150 apparent from this record that California's earlier dual school system shaped the existing San Mateo school system." Id., 1239.
The "more subtle" types of state action in that case, which apparently raised some questions in his mind as a fact finder at the trial court level, included the following offers of proof: the construction of a freeway effectively isolated blacks in the area, state planners were responsible for the black community around the school, the discriminatory racial policies of realtors licensed by the state and by state-chartered banks as well as "residential segregation, fostered by state enforced restrictive covenants [which] resulted in segregated schools." Id. He then concluded that "[w]hether any of these factors add up to de jure segregation in the sense of that state action we condemned in [Brown I] is a question not yet decided." Id.
Justice Douglas then raised what he referred to as "another troublesome question", namely, the remedy that should be provided under equal protection analysis where the state is found not to be "implicated in the actual creation of the dual system." Id., 1239. He answered his own question by stating that the only constitutionally appropriate "solution" in a situation where minority schools are not qualitatively equal to white schools would be to design "a system whereby the educational inequalities are shared by the several races." Id., 1241.
The preliminary injunction that was denied by Justice Douglas in Gomperts, supra, 404 U.S. 1237, had previously been denied by the District Court for the Northern District of California in Gomperts v. Chase, 329 F. Sup. 1192 (N.D. Cal. 1971), based on that court's conclusion that "[t]he most that can be said for plaintiffs' showing is that the district has not moved as rapidly and effectively to adjust racial imbalance as plaintiffs would like [but this] involves no constitutional deprivation." Id., 1196. The court also stated that "[i]f school boards are permitted, as they are, to do nothing to cure racial imbalance which is the product of a neighborhood plan impartially administered, it would be self defeating to hold" that the board cannot constitutionally take curative action [and if] neutrality is not unconstitutional, certainly action designed to cure undesirable imbalance is not, even though it may fall short CT Page 4151 of its goal." Id.
Finally, another expression of Douglas's views can be found in his dissent from the Supreme Court's affirmance, without opinion, of Spencer v. Kugler, 326 F. Sup. 1235,1237 (D.N.J. 1971), aff'd 404 U.S. 1027 (1972), in which the plaintiffs claimed that because the New Jersey statutes, subject to certain exceptions, required that school district boundaries be coterminous with municipal boundaries, racial balance became "mathematically impossible in many districts, thus providing unequal educational opportunities." Id., 1237. The court held that the statutes set a reasonable standard "especially in light of the municipal taxing authority", the challenged statutes were "unitary in nature and intent and any purported racial imbalance within a local school district results from an imbalance in the population of that municipality-school district [and that racially] balanced municipalities are beyond the pale of either judicial or legislative intervention." Id., 1240.
The District Court decision stated that Brown I never required anything more than a unitary school system even though some later federal cases held that a constitutional violation "might result from a mere passive refusal to redistrict unreasonable boundaries." Id., 1241. The court held that school district lines based on municipal boundaries were reasonable so long as they were not designed or intended to foster segregation. Id.
The Spencer decision relied principally on the "critical distinction" drawn in Swann v. Charlotte-MecklenbergBoard of Education, 402 U.S. 1 (1971), "between those states which have a history of dual school systems and a separation of the races which has continued through `freedom-of-choice' and `geographical zoning' plans which create the illusion of conforming to law, and those wherein so-called `de-facto' segregation results from housing patterns and conventional drawing of school district zones." Id., 1242. The District Court also noted that the New Jersey statutes were approved by the legislature on September 18, 1953, some eight months before Brown I, which was decided or May 17, 1954. Id.
The Spencer opinion concluded by stating that racial imbalance caused by housing patterns within the CT Page 4152 municipality-school districts were not "susceptible to federal judicial intervention." Id., 1243. "The New Jersey Legislature has by intent maintained a unitary system of public education, albeit that system has degenerated to extreme racial imbalance in some school districts; nevertheless the statutes in question as they are presently constituted are constitutional." Id.
In his dissent from the Court's judgment affirming the district court's opinion in Spencer, supra, Justice Douglas stated that the lower court had rejected the plaintiffs' claims that they were entitled to redistricting, a remedy that the Supreme Court had already found to be appropriate in voting rights cases; Reynolds v. Sims, 377 U.S. 533
(1964); and to which the plaintiffs should be entitled because "[t]he right to education in the environment of a multi-racial community seems equally fundamental." Spencerv. Kugler, 404 U.S. 1027, 1028 (1972). In the alternative, he stated, they were entitled either to an "appropriate racial balance" so that educational opportunity should not be determined by race, or to compensatory educational programs "to correct for the inferior schooling given minority students", but the proposed remedial approaches were rejected by the District Court's "finding refuge in de facto segregation." Id.
In a lengthy footnote to his dissent, Douglas quoted from a statement made at a Senate Subcommittee hearing by the United States Commission on Civil Rights in 1970 that "there is probably little substance to the concept of de facto school segregation." Id., 1029-30 n. 1. The Commission also stated that the federal government "has a moral as well as legal responsibility to undo the segregation it has helped to create and maintain [because there] is no statute of limitations by which government in its many forms can be exonerated from its past misdeeds or relieved of its current obligations." Id.
The court, as the finder of fact in this case, concludes from its review of all the evidence which has been presented in the course of these proceedings that the plaintiffs have not established any of what Justice Douglas described as the "more subtle" types of state action that are ordinarily presumed in "de facto segregation" cases, including more specifically the factors of residential CT Page 4153 segregation, as well as attendance zone boundaries, which are exclusively the statutory duty of local boards of education under § 10-220 of the General Statutes. The court also finds in accordance with the holding of Spencer v.Kugler, supra, 366 F. Sup. 1240, that "[r]acially balanced municipalities are beyond the pale of either judicial or legislative intervention." Id., 1240. The court therefore finds that the plaintiffs have failed to prove that "state action is a direct and sufficient cause of the conditions's" which are the subject matter of the plaintiffs' complaint as alleged in the defendants' sixth special defense, and that accordingly the constitutional claims asserted by the plaintiffs need not be addressed.
For the foregoing reasons, judgment is entered in favor of the defendants.